# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parentage of | No. 69446-4-I |
| E.S.S.,<br>C.E.I.S., | DIVISION ONE |
| Minor Children. | UNPUBLISHED OPINION |
| SIMON BRUCE SOTHERON, | |
| Appellant, | |
| and | |
| MEAGAN ANASTASIA PALMER, | |
| Respondent. | FILED: March 10, 2014 |

GROSSE, J. – When substantial evidence supports the trial court's finding that a parent's coercive and controlling behavior had an adverse impact on the children's best interests, the court's imposition of restrictions on that parent's residential time is a proper exercise of discretion.

## FACTS

Simon Sotheron met Megan Palmer around 2003. Palmer was in her early twenties when they met and was 12 years younger than Sotheron. Palmer had a six-year-old son, D.P., at the time. Around June of 2004, Palmer and D.P. moved in with Sotheron into a house that Sotheron owned. The couple never married but Sotheron assumed a parental role in D.P.'s life. In 2005, Sotheron and Palmer had a son together, E.S. In 2006, they had a daughter, C.S.

The couple separated in October 2007. During the separation, Palmer lived in an apartment near Sotheron's house and the two divided parenting responsibilities and shared the children equally. During most of the separation, Sotheron covered Palmer's living expenses, including those for D.P., with whom

he still spent significant time together. In June 2009, the couple reconciled and Palmer moved back into Sotheron's house.

The couple continued to have difficulties and in February 2010, Palmer moved out permanently. During this time, Palmer and Sotheron began exchanging the children equally again and Sotheron continued to support them and Palmer. Palmer and the children were completely dependent on Sotheron financially and he estimated that he paid Palmer approximately $4,500 per month. Sotheron continued to transport the children to and from school because Palmer had no vehicle.

Disputes between the parties arose about the amount of support Sotheron was to pay Palmer. Sotheron also sought to reconcile with Palmer and began to show up at her home unannounced, call her repeatedly, and send excessive e-mails and texts begging her to come back. He also began following D.P. and contacting him outside of the home.

Both Palmer and Sotheron were involved in new relationships during this time. Palmer began dating Robin Tafoya in March 2010. Sometime after that, Sotheron began dating Annie Njuguna, a single mother in her early twenties. At the time of trial, Njuguna was pregnant with Sotheron's child.

At the end of April 2010, Palmer sent Sotheron a text message asking that he return some of the children's belongings, pay her for child related bills, and give her a pharmacy card. She also asked that he not discuss his negative opinions of her personal life in front of the children. The message further stated that if he did not address these issues and pay child support by the end of the

2

week, he should not pick up the children, and she would file for full custody because he has "neglect[ted his] parental responsibilities."

In late May 2010, she sent him a text message stating that she was upset that he would not pay to have C.S.'s cavities filled or D.P.'s piano tuned, and that she was going to keep the children indefinitely and file for full custody and child support if he did not "honor [his] previous commitments" to her and the children. She again asked for the return of the children's belongings, payment of bills, and reimbursements for child related expenses. She also asked for "[t]he family vehicle or a replacement," and for him to discuss an additional property settlement. She further stated that if he refused to address these issues, she would take him to court and he would likely be ordered to pay the maximum in child and spousal support and give her half of his assets. Sotheron then calculated what the maximum amount of child support a court might order and based on that calculation, deposited $1,500 into Palmer's account on June 30, 2010.

On July 30, 2010, Palmer sent Sotheron a text message stating that he was to have no contact with the children or her, and that she would no longer tolerate his "irrational behavior and harassment." She told him to stay away from her friends and family, "especially [D.P.]" She stated that if he tried to contact them, she would file for a no contact order. On that same day, Sotheron filed a petition for a court ordered parenting plan and child support.

On September 1, 2010, Sotheron filed a proposed parenting plan. On September 9, 2010, Palmer filed a petition for a protection order restricting

Sotheron's contact with Palmer and the children. The court issued a temporary protection order with a hearing date set for September 23, 2010. On September 23, 2010, Palmer failed to appear for the hearing. Sotheron appeared and the court set another hearing date of October 7, 2010.

On October 7, 2010, the court extended the temporary order to November 4, 2010, to allow Palmer to retain counsel for the hearing on that date. The court also authorized Sotheron to have supervised visitation with the children. On November 4, 2010, the court again extended the order to a new court hearing date that was set for November 18, 2010. The court also ordered that Sotheron have unsupervised visitation, finding no basis for requiring supervised visits at that time. The court further set a residential schedule pending the hearing and appointed a Guardian Ad Litem (GAL), Pam Edgar. On November 18, 2010, the court granted another continuance at Palmer's request and continued the hearing to December 7, 2010.

On December 7, 2010, the court ordered a temporary parenting plan that was essentially the shared parenting schedule Sotheron and Palmer used previously. The order provided that any restrictions on contact would be reserved pending the GAL's investigation. The court also entered an order dismissing the protection order, finding that "[a] preponderance of the evidence has not established that there is domestic violence/stalking."

In January 2011, the parties participated in an evaluation with the GAL, which included interviews with Sotheron and Palmer, and home visits with the children. The GAL also interviewed Sotheron's girlfriend Njuguna. At some point

in February 2011, Njuguna contacted the GAL to relay concerns she had about Sotheron. She said that Sotheron had quizzed her about what she might tell the GAL and that he "pressured her to the point of insanity to abort a[n earlier] pregnancy." She further reported that when she became pregnant a second time, he "kept her up all night badgering her and trying to convince her to have another abortion, and that she spontaneously miscarried," she believed, as a result of that pressure.

Njuguna e-mailed the GAL a few more times and on April 18, 2011, she contacted the GAL to tell her that Sotheron had assaulted her while they were away in Las Vegas, Nevada together. According to Njuguna, she and Sotheron had a fight in the hotel room over her reading e-mails on his phone without his permission, there was a struggle over the phone and she called the police. According to the police report, she said he forced the door closed when she tried to leave. After the police left, she flew back to Seattle by herself. On April 21, 2011, she faxed a letter to the district attorney in Nevada requesting dismissal of the charges.

In April 2011, the GAL issued a report recommending a residential schedule that would have the children reside with Sotheron every other weekend from Friday to Monday and every Wednesday from after school until Thursday morning. The GAL further recommended that Sotheron seek treatment. Palmer then requested that the temporary parenting plan be revised consistent with this recommendation.

On July 6, 2011, a commissioner amended the temporary parenting plan

and required Sotheron to enroll in a state certified domestic violence (DV) treatment program. The amended temporary parenting plan provided that his residential time would begin once the GAL verified that he began treatment and specified David Vandegrift as his treatment provider. The amended temporary parenting plan also provided for a new residential schedule allowing Sotheron to be with the children every other weekend and every other Wednesday on opposing weeks.

The parties proceeded to trial on the final parenting plan. Before trial, the parties returned to the GAL for an update to determine whether her recommendations should be modified based on Sotheron's treatment progress and the children's adjustment. The report noted that Vandegrift reported that Sotheron had not disclosed his arrest for assault in Las Vegas and that Njuguna had contacted Vandegrift to report that Sotheron had been harassing her to terminate her current pregnancy and even offered her $25,000 to abort it. The GAL's report recommended that her previous recommendations remain in place, noting that "Annie[ Njuguna]'s reaching out to Simon's DV treatment provider is cause for concern," and that Sotheron's behavior demonstrated that he had not successfully completed treatment:

> Simon suggested that since he is in compliance with his treatment program the parenting plan should return to a fifty-fifty shared parenting plan. However, it is one thing to be in compliance, (attending and participating) and another to demonstrate behavioral change. The program Simon is in is demonstration based not time based. Participants "graduate" when they have both acknowledged and demonstrated an understanding on the impact on others. According to Mr. Vandergrift [sic] this has not occurred to the degree desirable.

At trial, Palmer testified that Sotheron parented in a controlling and critical manner, too harshly disciplined the children, and had unrealistic expectations and standards for the children. For example, he would require D.P. to make his bed with military corners at age six and if they were not perfect, he would rip the sheets off the bed and make him redo it several times again perfectly. Palmer also testified that if D.P. closed the toilet seat loudly, Sotheron would make D.P. open and close it several times and would make him do it all over again if D.P. "messed up." She recalled that they would "be in there for half an hour sometimes with [D.P.] just in tears. . . ." For punishment, Sotheron made D.P. sit in the middle of the back yard outside in the dark at night, while D.P. cried. Palmer also testified that Sotheron often put down D.P. verbally and called him names.

Palmer further testified that Sotheron was obsessive with the children's homework, tracking every bit of school work D.P. did at age six. She described an incident when he dumped out D.P.'s desk at school and scolded him for not being tidy. She also testified that Sotheron made D.P. write in cursive before it was required in school and D.P. would spend hours crying at the table doing his homework because it was never up to Sotheron's standards.

Palmer testified that Sotheron treated her similarly. She was the homemaker, raising the children, and tending to all the household tasks, and he was extremely critical of her efforts. According to Palmer, he expected her to "cater to all of his needs" and would scold her if she failed. For example, he would scold her if she was too exhausted to drive him to work in the morning

because she had been up all night with the baby, if she cleaned one bathroom but not the other, or did half the laundry. He also photographed anything he viewed as imperfections, such as dirty dishes, unfinished laundry, and cigarette butts she had discarded. He even videotaped her drinking wine and smoking and threatened to show everyone what a terrible mother she was. He kept her on a weekly cash allowance, which he would withhold if he was displeased with her performance of the household tasks.

Palmer further testified that Sotheron's displeasure would often escalate to anger that frightened her and at times, prompted her to try to leave. During one incident, in August 2005, she eventually called the police after "hours and hours" of him following her around the house and badgering her. She tried locking herself in the bathroom but had to come out to comfort the children who were scared by Sotheron's "storming around the house." To keep her from leaving, Sotheron collected her personal belongings and locked them in the garage. Police arrested Sotheron, but no charges were filed.

Palmer also described another incident when he first became physical with her in front of D.P. She was pregnant with E.S. and during an argument, he grabbed and shook her, then gave her a push, injuring her lip and causing it to bleed. Sotheron left and as she was trying to call the police, he returned and apologized. She never called the police. Palmer also testified about another incident in August 2006, where she called the police and reported that he tampered with the home telephone line in an attempt to prevent her from calling the police. He was arrested but no charges were filed.

Sotheron testified that his relationship with Palmer was always volatile and that she often escalated their arguments. He said she would often hit Sotheron or grab his keys or wallet and if he tried to drive away, she would throw things at the car. He described an incident when he called the police after Palmer threw a picture frame at him and it missed and broke a window. He testified that she would hit, pinch, or spank the children for discipline, whereas he used discussions and time-outs. As for homework, he felt Palmer was too lax about if and when it was completed, while he believed it was important to make it a priority and have it done promptly.

Sotheron also presented evidence of a Child Protective Services (CPS) referral against Palmer on December 5, 2010, when the police were called because four-year-old C.S. was found wandering down Jackson Street in her pajamas at 6:30 a.m. The police located the other two children asleep in the apartment and determined that C.S. had left through the back door of her ground floor apartment looking for Palmer. They woke D.P., who told them his mother went out for the night with friends and provided her phone number. They eventually reached Palmer after contacting Robin Tafoya. Palmer came home and explained that she had too much to drink and went to her boyfriend's to sleep it off. A referral was made to CPS, but it was determined that the "information reported did not meet the sufficiency screen for a CPS investigation."

The GAL testified consistent with her report. Vandegrift testified that he determined that Sotheron met the criteria to participate in a DV treatment

9

program, noting that while Sotheron had not harmed his victims physically or sexually, his behavior had a severe emotional, psychological, and financial impact on Palmer. He further testified:

> The thing, the issues that I went ahead and identified as severe level is the chronicity of the verbal violence was consistent, denial of the risk for noncompliance measures -- I noted "Denial of responsibility, blames victims, blames circumstances, justifies violence, minimization, attempts to withhold information, attempts to confuse or distort info." The violence risks I identified as obsessing or dwelling on the victim in that he was identifying her as the primary aggressor.

The trial court found that there was no domestic violence in this case to support a restriction on Sotheron's time with the children under RCW 26.09.191. But the court did make a finding that his time should be restricted under RCW 26.09.191(3)(g), based on "a pattern of coercive behavior without physical violence in this case." The court restricted Sotheron's time to alternating weekends and Wednesday nights with the children. The court also prohibited the parents from removing the children out of state without agreement or court approval for 18 months. The court rejected Sotheron's request to apply restrictions to Palmer's residential time under RCW 26.09.191(3)(f), based on her withholding of the children for a protracted period without good cause.

The court ordered a final parenting plan that included the above restrictions. The parenting plan did not require Sotheron to continue DV treatment unless he wished to do so, but did indicate that "the father needs continuing treatment of some form, which should be determined by the father." Sotheron moved for reconsideration of the final parenting plan order, which was denied. Sotheron appeals.

ANALYSIS

I. RCW 26.09.191(3)(f) Restrictions: Withholding Access to Child

Sotheron contends that the trial court erred by failing to restrict Palmer's residential time under RCW 26.09.191(3)(f), which permits the court to "preclude or limit any provisions of the parenting plan" if "[a] parent has withheld from the other parent access to the child for a protracted period without good cause." Sotheron contends that Palmer withheld the children from him because he would not comply with her demands for money, which does not constitute good cause.

We review a trial court's ruling on provisions in a parenting plan for an abuse of discretion.[1] We will uphold the trial court's findings if substantial evidence exists in the record to support it.[2] "So long as substantial evidence supports the finding, it does not matter that other evidence may contradict it. This is because credibility determinations are left to the trier of fact and are not subject to review."[3]

The trial court denied Sotheron's request to impose restrictions on Palmer's residential time under RCW 26.09.191(3)(f) for withholding the children, finding:

> The mother did withhold the children after July 30th. The petition was filed July 30th. From the evidence of the emails, some of the reasons were money promised for support, money being sought, the holding of possessions of the children. Other reasons were harassment and, from her testimony, the concern she had with the father following [D.P.], who is not a part of this proceeding. An order of temporary protection was sought and granted on

---

[1] In re Marriage of Littlefield, 133 Wn.2d 39, 46, 940 P.2d 1362 (1997).
[2] Burrill v. Burrill, 113 Wn. App. 863, 868, 56 P.3d 993 (2002).
[3] Burrill, 113 Wn. App. at 868 (citing State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990)).

September 9th. There was [sic] a number of continuances and the father was finally granted some residential time on October 7th by the court. The protection order was ultimately dismissed. There was subsequently a report from the guardian ad litem recommending that the court find a domestic violence restriction.

The court concludes in term of this issue that there was a withholding. Some of the reasons were for good cause: the reasons of harassment, domestic violence, the following of [D.P.] Some were not for good cause: the seeking of funds, the seeking of monies that had not been agreed. Whether or not there was a protracted period, the period under the mother's control was relatively short, from September 30th until the court was issuing the orders. So based upon these facts, the court does not find sufficient evidence to support the finding by a preponderance.

The trial court's finding is supported by substantial evidence. The July 30, 2010 text references the harassment and following of D.P.:

You are to have no contact with my children or myself in anyway. I will not tolerate your irrational behavior and harassment anymore. If you choose to disregard my request I will immedietly [sic] file a no contact order. No calls, emails, text messages, mail, stay away from my friends and family. And especially stay away from [D.P.]

Palmer also testified to such facts as follows:

The last straw for me was when he had started following and confronting D.P. He was terrified. And that's when I called Simon and I said, "This is it. You can't show up at our place unannounced. I need you to stop calling excessively late at night and texting and emailing and you have got to stop following us around." I said, "If you don't, I'll have to file a restraining order." And he refused. He said, "You're not going to tell me what to do, and I have every right to see [D.P.] and I have every right to contact you and try to communicate with you." And I said, "Actually you don't. Not like that. If it's with regards to the children, yes." As far as us discussing the relationship and that's the stuff he wanted to talk about and control issue, I said, "Absolutely not."

Additionally, Palmer testified to Sotheron's following of D.P. and its negative effect on D.P. While Sotheron seems to suggest that evidence relating to D.P. is not relevant because he is not a party to the proceeding, it was in fact relevant to

her withholding of the children, which included D.P., and the undisputed evidence established that he had a significant relationship to the other children and that Sotheron acted as a parent to him.

The other texts also refer to Sotheron's negativity toward Palmer in front of the children as "tremendously" affecting the children, his neglect of parental responsibilities other than those that were financial, and her inability to transport the children without use of the vehicle that was within his control. Thus, while Sotheron is correct that, as the trial court recognized, there may have also been improper reasons for withholding the children, the trial court's finding that there were other reasons sufficient to establish good cause is supported by the record. And the statute is clear that imposition of restrictions for withholding children is not mandated, as Sotheron seems to suggest, but is discretionary with the court.[4] Sotheron fails to show that the trial court abused its discretion by declining to impose restrictions on this basis when there were some legitimate reasons for the withholding.

## II. RCW 26.09.191(3)(g) Restrictions: Coercive and Controlling Behavior

Sotheron contends that the trial court erred by imposing restrictions on his residential time under RCW 26.09.191(3)(g) based on a finding that his pattern of coercive and controlling behavior had an adverse impact on the children's best interests. We disagree.

RCW 26.09.191(3)(g) provides:

> (3) A parent's involvement or conduct may have an adverse

---

[4] RCW 26.09.191(3)(f) (providing that the court "may" preclude or limit any provisions of the parenting plan, if any of the listed factors exist).

13

effect on the child's best interests, and the court may preclude or limit any provisions of the parenting plan, if any of the following factors exist:

. . . .

(g) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

As noted above, we review the trial court's decision to impose restrictions on this basis for an abuse of discretion.

Here, the trial court found:

The court finds that father's time with the children should be restricted pursuant to RCW 26.09.191(3)(g)(such other factors or conduct as the court expressly finds adverse to the best interest of the child). Specifically, the court finds there is a pattern of coercive behavior without physical violence in this case and finds the following factors that are adverse to the best interests of the children:

1. There is a history of domestic violence arrests and charges without convictions. There is the August 5 incident where the mother wanted to leave and the father did not want her to leave with the child, and he started collecting her possessions, the purse, phone, and keys. When police were called and wanted a car seat given, the father did not want police to allow her to take that car seat. There was the [Au]gust 6 incident – the father was upset about financial charges and he admits he pulled the phone cord. This was six weeks after the incident where the allegations of physical force were made. There was the October 7 incident where the investigation of the mother moving out was made and she testified that he would not let her leave.

2. Court relies on opinions of the experts.

A. GAL Pam Edgar

Ms. Edgar found a pattern of coercive behavior, financial control, some isolation, relentless pursuant [sic] in arguments, attempts by father to prevent mother from leaving, attempts to prevent mother from calling for aid. Court finds the GAL report credible. Although the GAL's use of the term "visits" is disturbing, it is not sufficient in itself to show bias. The GAL spoke to a number of collateral resources and the court finds her report thorough and reliable.

B. Iren Arden, Ph.D.

Dr. Arden testified that the father was rigid, controlling of house and could not find a worker up to his standard and has perfectionist traits.

14

C. <u>David Vandegrift</u>, DV treatment provider
Mr. Vandegrift concluded that the emotional, psychological and financial damage to mother was severe.

The court's findings also referred to Njuguna's testimony:

It was clear by her demeanor that she did not want to testify and exhibited fear on the stand. Ms. Njuguna is young, single and is pregnant with petitioner's child who offered her $25,000 to terminate the pregnancy.

Most compelling to the court is it appears that while this case was pending, father is reenacting the pattern that he had with the mother in this case. This includes his arrest in Nevada for domestic violence and father's contradictory testimony about Njuguna's cell phone, which he ends up taking with him. Ms. Njuguna reported to the GAL how it makes her feel crazy to bring up statements petitioner made.

Father did not report this DV arrest in Nevada to his treatment provider.

Father replaces Ms. Njuguna's phone giving him access to her phone information.

Father told process server that Ms Njuguna did not live at his house and he had never heard of her. The testimony was clear that she had lived there at least at some point in time and he was supporting her to some degree. Additionally, she was calling the GAL and Mr. Vandegrift for assistance.

All of the above factors affect parenting.

The court also considered Palmer's testimony about D.P.:

Court also considers compelling testimony of mother, Meagan Palmer, regarding Petitioner's treatment of her son [D.P.] This included testimony that Simon Sotheron was involved in every aspect of their lives and with her son [D.P.] it escalated to something that became a problem. With [D.P.] it was taken to a [sic] the level of obsession – Petitioner would dump out [D.P.'s] desk at school, with his handwriting petitioner made [D.P.] write cursive before it was required and made him write every letter, if one wrong, he would erase it and make [D.P.] write it over and over constantly. This type of behavior was a major source of our conflict between the parents. Petitioner would make [D.P.] make the bed with military corners and close the toilet seat over and over if [D.P.] closed it too hard. Mother testified that [D.P.] had no space, he was walking on egg shells, the punishment was too severe.

As detailed above, the record supports the trial court's findings. While Sotheron

contends that many of the facts were disputed, we cannot disturb the court's findings.

Nor does Sotheron show that the trial court abused its discretion by imposing the restrictions based on these findings. "By its terms, RCW 26.09.191(3) obligates a trial court to consider whether '[a] parent's involvement or conduct *may* have an adverse effect on the child[ren]'s best interests.' . . . To make this determination, the court must engage in a form of risk assessment."[5] Palmer's testimony established that Sotheron's controlling and coercive parenting tactics had negative effects on D.P., which was relevant to assessing the possibility of future harm of such behavior to the other children.[6] Additionally, the GAL testified to the adverse effects of Sotheron's unlimited involvement with the children:

> I felt that there was more likely than not evidence of .191 restrictions, both in terms of his ability to provide a safe and conflict-free and non-abusive household, as well as concerns about his overall inflexibility and the implications for parenting.
>
> . . . .
>
> And so that tendency to be rule bound and inflexible becomes really difficult as kids get older and they try to assert autonomy. The other thing about it is it tends to be performance and task based so that kids in those environments feel that affection and love is conditioned on doing things right, not making mistakes, being perfect, having high performance. So kids become anxious because they're stressed by that, and at times, they become resistant and act out.

Accordingly, that Sotheron's coercive and controlling behavior was adverse to

---

[5] Katare v. Katare, 175 Wn.2d 23, 39, 283 P.3d 546 (2012) (alterations in original).

[6] See Katare, 175 Wn.2d at 39 ("deciding whether to impose restrictions based on a threat of future harm necessarily involves consideration of the parties' past actions").

the children's best interests was a reasonable conclusion based on the evidence. Sotheron fails to show the trial court abused its discretion by imposing restrictions on this basis.

### III. Restrictions on Travel

Sotheron challenges the restriction in the parenting plan prohibiting the parents from removing the children out of state without agreement or court approval for 18 months. The parenting plan initially required court approval or agreement of the parties to remove the children out of state. Sotheron, who is Australian, asked the court to clarify that provision to allow him to travel to Australia with the children to visit his parents who would soon be celebrating their 50th anniversary. Palmer opposed this request, contending that she had "trust issues" with Sotheron. As her attorney explained:

> Australia is almost a full day of travel. It's a 21-plus hour flight, and these are a five- and a seven-year-old child. And that in and of itself. The kids are not in a position to advocate for themselves in any way, shape, or form if things became uncomfortable for them or they weren't feeling safe, they have no cognitive and physical ability to reach out for help. So it's the duration, the youth of the children.

The court then decided to just limit the restriction to 18 months, explaining:

> Given the age of the children, given the high conflict nature of this action. And after that, there can be other arrangements. But I don't think there's a sufficient showing. After that, I'm hoping that after time, the amount of conflict lessens, the children will be older, they'll have more ability to raise any concerns that they have, so I'm going to limit 3.13 for the next 18 months.

Sotheron fails to show that the trial court abused its discretion. While there was no threat of abduction, there was already a basis for restricting his residential time and the court simply extended this to travel with the children. Additionally,

the restriction was temporary and reasonably calculated to address the identified harm.[7] Indeed, as the parties acknowledged at oral argument, the 18-month restriction period is either at or near expiration, which will render the issue moot.

IV. Mother's Level of Involvement with the Children

Sotheron next contends that the trial court improperly considered Palmer's level and extent of involvement with the children while the parenting plan action was pending because she was only able to do so after withholding the children and seeking temporary protection orders and parenting plans that restricted his time.[8] But as Palmer correctly notes, the involvement to which the court referred was throughout the children's lives, not just during the pendency of the parentage action:

> There's no disagreement that the mother was the stay-at-home parent. She took greater responsibility for the daily needs of the children. There's no disagreement that the father was involved with the children, particularly regarding homework and school. Each of them has a stable, loving relationship with the children. The mother's relationship the court would find is stronger at this point due to the level and extent of her involvement.

The record supports this finding. Sotheron's argument is therefore without basis.

V. Hearsay Statements

Finally, Sotheron challenges the admissibility of the GAL's updated report because it contained mostly hearsay statements, citing a recent United States Supreme Court case holding that the confrontation clause prohibited an expert from testifying to hearsay statements in a criminal case.[9] But as Palmer correctly

---

[7] See Katare v. Katare, 125 Wn. App. 813, 826, 105 P.3d 44 (2004).
[8] See In re Marriage of Watson, 132 Wn. App. 222, 234, 130 P.3d 915 (2006).
[9] Williams v. Illinois, __ U.S. __, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012).

notes and Sotheron acknowledges, the confrontation clause does not apply in civil cases. Rather, the law permits the court's consideration of such hearsay in Title 26 proceedings. As provided by RCW 26.09.220:

> (1)(a) The court may order an investigation and report concerning parenting arrangements for the child, or may appoint a guardian ad litem pursuant to RCW 26.12.175, or both. . . .
>
> . . . .
>
> (2) In preparing the report concerning a child, the investigation or person appointed under subsection (1) of this section may consult any person who may have information about the child and the potential parenting or custodian arrangements. . . . If the requirements of subsection (3) of this section are fulfilled, the report by the investigator or person appointed under subsection (1) of this section may be received in evidence at the hearing.[10]

And as the court held in <u>In re Guardianship of Stamm v. Crowley</u>:

> In performing his or her duties under the statute, a GAL is required to consult with those knowledgeable about the allegedly incapacitated person. The statute thus contemplates that hearsay will be a basis for the GAL's opinions. And in order to evaluate the GAL's opinions, the fact finder needs to know the basis for them.
>
> We therefore hold the trial court has discretion under ER 702 to permit a GAL to testify to his or her opinions if the court is persuaded the testimony will be of assistance, and may permit the GAL to state the basis for those opinions, including hearsay.[11]

We affirm.

WE CONCUR:

---

[10] Subsection (3) addresses procedures for report submission. RCW 26.09.220(3).

[11] 121 Wn. App. 830, 837, 91 P.3d 126 (2004).