56 P.3d 993 (2002)
In re the Marriage Of Cynthia L. BURRILL, Appellant,
v.
Don R. BURRILL, Respondent.
Nos. 49205-5-I, 49817-7-I.
Court of Appeals of Washington, Division 1.
September 9, 2002.
Publication Ordered October 10, 2002.
*994 Jordan Gross, Seattle, for Appellant.
Brendan Finucane Patrick, Seattle, Non-party.
John Stocks, Van Siclen Stocks & Firkins, John Paul Bagley, Auburn, for Respondent.
BAKER, J.
In a consolidated appeal, Cynthia Burrill (Cindy) challenges a final parenting plan awarding primary residential care of the parties' children to the father, the trial court's attorney fee award, and Donald Burrill's (Don) postdissolution judgment for damages. Because substantial evidence supported the trial court's findings, which in turn supported its conclusions of law, we affirm.

I
At the time Cindy Burrill and Don Burrill dissolved their marriage, both had been equally providing for the care their daughters, E.B., age 9, and A.B., age 4. Because of his flexible work schedule, Don had cared for the girls during the day. Cindy had cared for them in the evenings.
Because both parties wanted to be the primary residential parent of the children, they agreed that Zany Milo should perform a parenting plan evaluation. Pending the completion of Milo's report, the parties agreed to continue sharing the care of the children. During the evaluation, Cindy made unsubstantiated reports that Don abused alcohol and marijuana. She also accused him of having an anger management problem and *995 succumbing to road rage. She described him as paranoid and suspicious.
Upon conclusion of her evaluation, Milo opined that both parents should participate in counseling and that Don should complete an alcohol and drug program. Don voluntarily entered T.A.S.C., but was excused early because no apparent problems existed. Milo recommended that Cindy have primary residential care of the children and, so long as the conflict between the parties did not escalate, Don should continue to care for the girls during the week while Cindy worked. If conflict between the parties made the arrangement impracticable, then Cindy was to arrange for a third party to care for the children during the day.
Four months after Milo issued her report, an incident occurred in the exchange of the children at the end of a workday. Tempers flared over an issue concerning one of the girl's shoes. The next morning, Cindy unilaterally terminated Don's contact with the children, citing Milo's report that Don's care of the children should stop if conflict escalated. After much effort, which included hiring a new attorney because his own was on vacation, Don regained contact.
Two weeks before trial, Cindy reported to a pediatrician that A.B. had complained of Don touching her genital area in the bathtub. The physician referred Cindy to Child Protective Services (CPS). A.B. was interviewed by the Harborview Hospital Center for Sexual Assault and Traumatic Stress. The matter was then referred to the King County Prosecutor's Office. Don was arrested and charged with first degree rape of a child. The trial in the dissolution of marriage action was continued for eight months.
For three months, Don was not allowed to see the children. Despite Cindy's strenuous opposition, he was eventually allowed one supervised visit per week with the oldest child for a space of two hours. Later, the younger daughter also joined these visits. Ultimately, the charges were dismissed because A.B.'s accounts of what occurred were vague and inconsistent. In total, the children's relationship with their father was disrupted for a period of nearly nine months.
During trial, the CPS worker who had declared the sexual abuse allegation to be "founded," testified that she based her conclusion on her misunderstanding of the initial physician's report. She thought the report stated that digital vaginal "penetration" had occurred, when in fact, the report said that vaginal contact had occurred. The CPS worker testified that vaginal contact is consistent with a parent washing his child during bathtime and is not sexual abuse.
The testimony also showed that the vocabulary the four-year-old had used to report what happened did not make clear what actually happened. The investigators, rather than clarifying with the child what "fingers in [her] body" meant, inferred that it meant either anal or vaginal penetration, although they could not conclude which. They dismissed the possibility that A.B.'s report that Daddy had "touched [her] pee-pee" simply meant that Don had washed between her labia and that, with her undisputed history of redness and irritation in the area, it had hurt.
The trial court concluded that the sexual abuse allegations were unfounded. It also concluded that Cindy had engaged in an abusive use of conflict and awarded the family home and primary residential care of the children to Don. She ordered that Don have sole decision-making authority for the children. Finally, Don was awarded $25,000 in attorney fees.
When Don assumed possession of the home, he discovered that Cindy had removed the kitchen appliances and all of the children's furniture, toys, clothing, and light switch cover. She left the house in a state of filth and disrepair. Don sought damages in a postdissolution motion to enforce the decree of dissolution. He was awarded $3,000 in damages. Cindy appeals the parenting plan, the award of attorney fees, and the postjudgment award of damages.

II
Cindy first argues that the trial court erred in finding that she supported unfounded allegations of sexual abuse. An appellate court will uphold a finding of fact if *996 substantial evidence exists in the record to support it.[1] Evidence is substantial if it exists in a sufficient quantum to persuade a fair-minded person of the truth of the declared premise.[2] So long as substantial evidence supports the finding, it does not matter that other evidence may contradict it. This is because credibility determinations are left to the trier of fact and are not subject to review.[3]
The evidence at trial showed that A.B. had a history of redness and irritation in her genital area prior to Cindy's allegation of abuse. Generally, Cindy treated A.B. with Desitin, attributing the condition to hygiene issues. But one night, when A.B. complained of irritation, her mother responded by asking her whether anyone had hurt her. To this question, A.B. answered that her Daddy had hurt her in the bathtub. Regardless of whether or not Cindy's judgment was questionable by asking A.B. such a leading question, her act of taking A.B. to a physician can only be characterized as prudent.
Nevertheless, it is her later conduct that supports the trial court's finding. To the CPS investigator, she reported that she and her husband were going through a "nasty" divorce. She alleged that Don regularly received homosexual pornographic material in the mail, which the girls had seen. But when interviewed, both girls said they had never seen "any magazines of people doing naked or grown-up things." Cindy averred that the children hated going to their father's home and were uncomfortable there. In fact, multiple witnesses testified that the girls were well bonded to their father and that they enjoyed spending time with him. She also made unsubstantiated claims that Don abused alcohol and drugs.
Finally, when Cindy took A.B. to the Harborview Sexual Assault evaluator, she made the suggestive statement to her daughter that they were going to see some ladies to get some help so that A.B. and Cindy wouldn't get hurt. When A.B. arrived at the evaluation, she blurted out the unsolicited statement that, "Dad used to put his fingers in my body." But when the evaluator said that she'd like to understand more about that, A.B. simply replied, "Mom didn't tell me." This evidence is sufficient to support the trial court's finding that Cindy supported and encouraged unfounded allegations of sexual abuse against Don.
Cindy next argues that the trial court erroneously found that "no" evidence supported her allegations about Don regarding sexual abuse, mental instability, substance abuse, road rage, weapons brandishing, and an anger management problem. She claims that because each of these findings are erroneous, they cannot support the trial court's conclusion that she engaged in an abusive use of conflict. We will uphold a conclusion of law if the trial court's findings of fact supports it.[4] A review of the record shows no error in the findings and further, that they support the trial court's conclusion that she engaged in an abusive use of conflict.
First, contrary to Cindy's assertion, the trial court did not find that "no" evidence existed to support her allegation of sexual abuse. Rather, it found that she supported allegations of sexual abuse that were unfounded. Similarly, we need not review Cindy's contention that evidence existed of Don's mental instability because she has cited none. Further, Cindy points to no evidence in the record that Don abused marijuana, engaged in road rage, or brandished a weapon.
Cindy supports her allegation of Don's alcohol abuse with Zany Milo's parenting plan evaluation, which contains summaries of interviews with Don, his therapist, and E.B.'s therapist. But Milo's report states that Don ceased consuming alcohol in January 1999 and had maintained sobriety with case. Trial was held in 2001. Likewise, E.B.'s therapist testified that she had no *997 indication that there was any drunken behavior by Don. She also testified that she was concerned that maybe the child had been coached by her mother. Finally, T.A.S.C. of King County dismissed Don from the program because he had "no apparent problem." None of this evidence points to a current alcohol abuse problem. The trial court's finding was supported by the evidence.
To support her accusation of anger management problems, Cindy again relies on the interview summaries contained in Dr. Milo's report. Don's work supervisor was reported as saying that "[Don] has put off some coworkers, but gets along fine with others." This is not evidence of an anger management problem. Especially in light of the supervisor's conclusion that he had "found no fault with his productivity or the way he interacts."
Similarly, the daycare provider reported to Milo that she had "seen ... a short fuse now and then on Don, but nothing that got out of hand." From the first grade teacher, Dr. Milo reported that "Don is simply a more intense person than Cindy is. My gut feeling is if Don is not happy it may be loudly expressed." Next, Cindy's sister-in-law reported to Milo that, "There are lots of things [Cindy] has told me about him that makes me nervous. I think he definitely has a temper, and he has to be right. In a restaurant, in a hotel, people drivingthose people are always wrong and he is always right."
Finally, Cindy asserts that Don admitted shaking his fist at her. Indeed, in Don's declaration, he explained that he has a snoring problem. He stated that Cindy would hit him and shove him in an effort to get him to stop snoring, and once he woke up and shook his fist at her and told her to stop. None of this evidence supports the allegation that Don has a problem managing his anger. The trial court's finding to that effect is supported by the record.
In sum, all of the trial court's findings were supported by substantial evidence. In turn, they support the trial court's conclusion that Cindy engaged in an abusive use of conflict.
Cindy contends that even if she did engage in an abusive use of conflict, the trial court's imposition of parenting plan restrictions was erroneous because there was no evidence that the children had been alienated from Don.[5] In order to restrict a parent's role under a parenting plan, the trial court must find, inter alia, that the abusive use of conflict by the restricted parent creates a danger of serious damage to the children's psychological development.[6]
Here, Cindy is correct that no evidence showed that the children's affections had been alienated from their father during the course of the litigation. But evidence of actual damage is not required. Rather, the required showing is that a danger of psychological damage exists. The trial court found that the father had provided full care of the children during work days for more than two years prior to the parties' separation. He shared in the daily parenting functions of the children. The record reflects that after Don was criminally charged with rape of a minor, Cindy strenuously opposed any contact by both children with their father, supervised or otherwise, despite the fact that they were well bonded with him and enjoyed being with him. Indeed, for a period of nearly nine months, the children either did not see their father, or had very limited access to him. This severe impairment of parent/child contact, especially when considered in light of the numerous interviews A.B. was subjected to asking her about the bad things her daddy did to her, constitutes sufficient evidence from which the trial court could conclude that Cindy created a danger of serious psychological damage to the children. The trial court did not err.
Cindy argues that the trial court improperly limited her decision-making and residential time because it determined that Don was the parent more likely to foster the children's *998 relationship with the other parent. This "friendly parent" concept has been specifically rejected in Washington.[7] But Cindy points to no findings or conclusions by the trial court addressing the question of whether one parent or the other would better foster the children's relationships. Neither can they be implied. Her claim lacks merit.
Cindy next asserts that the testimony of Don's expert witness regarding the parenting plan lacked adequate foundation. But she did not make this objection to the trial court. We decline to consider the issue.[8]
She also contends that the trial court erroneously adopted wholesale the parenting plan recommendations of Don's expert. But the trial court was entitled to rely on the expert's testimony. Moreover, the court's findings referenced other evidence to support the final parenting plan. The final plan differed from the expert's recommendations to the extent that Cindy was awarded a midweek visit each week and was allowed to move for increased time after participation in counseling. There was no error.
Cindy argues that the trial court had no basis to award Don $25,000 in attorney fees. In an action for dissolution of marriage, a trial court may order one party to pay a reasonable amount in attorney fees and costs to the other party after considering the financial resources of both parties.[9] A trial court may also award attorney fees if one spouse's intransigence increased the legal fees of the other party.[10] In that event, the financial resources of the parties are irrelevant.[11] Where a party's bad acts permeate the entire proceedings, the court need not segregate which fees were incurred as a result of intransigence and which were not.[12]
In this case, the trial court found that Cindy had made unsubstantiated, false, and exaggerated allegations against Don concerning his fitness as a parent, which caused him to incur unnecessary and significant attorney fees. The record demonstrates that Cindy's allegations permeated the entire proceedings, obviating the need for any segregation of fees. The court did not abuse its discretion in awarding fees.
Cindy next contends that the trial court lacked jurisdiction to enter a postjudgment order concerning damage caused by Cindy upon leaving the family home. RAP 7.2(c) allows a trial court to enforce its decision after a notice of appeal has been filed. A trial court may also hear a postjudgment motion authorized by the civil rules or statutes.[13] In this case, Don was awarded the family home. Each party was awarded their respective furniture, clothing and personal effects then in their possession.
When Don moved into the house, Cindy had taken the stove and refrigerator and had also taken everything from the children's bedrooms, including the furniture and the light switch cover. In addition, she had removed window coverings and left the house in a state of filth, including cat feces ground into the carpet and garbage strewn about. The trial court fairly concluded that the award of the home to Don included the appliances. It was also fair to conclude that the award of the home implied that it be left in a habitable condition. The award of damages because of these problems with the home upon transfer to Don is an enforcement of the decree, over which the trial court had jurisdiction.
Cindy argues that evidence does not support the award of damages. Don declared that he needed $1,000 per child to replace their furniture, $1,794 to replace the appliances, $2,000 to replace window coverings, and $1,000 for professional carpet cleaning, dump fees, and his time. He submitted an *999 invoice for replacement of the appliances in the sum of $1,794. The court did not abuse its discretion in entering a postjudgment award of $3,000 for the appliances, bedding, and cleaning the house.
Finally, both parties request fees on appeal. RCW 26.09.140 authorizes an award of fees after consideration of one party's need and the other party's ability to pay. After reviewing the parties' financial affidavits, we conclude that each should pay his or her own fees and costs incurred on appeal.
AFFIRMED.
AGID AND SCHINDLER, JJ., concur.
NOTES
[1] Holland v. Boeing Co., 90 Wash.2d 384, 390, 583 P.2d 621 (1978).
[2] Holland, 90 Wash.2d at 390-91, 583 P.2d 621.
[3] State v. Camarillo, 115 Wash.2d 60, 71, 794 P.2d 850 (1990).
[4] Panorama Village Homeowners Ass'n. v. Golden Rule Roofing, Inc., 102 Wash.App. 422, 425, 10 P.3d 417 (2000), review denied, 142 Wash.2d 1018, 16 P.3d 1266 (2001).
[5] The trial court restricted Cindy from participating in major decisions concerning the children. It also retained jurisdiction to allow the mother, upon conclusion of counseling, to move for increased time with the children as the nonprimary residential parent.
[6] RCW 26.09.191(3)(e).
[7] In re Marriage of Lawrence, 105 Wash.App. 683, 688, 20 P.3d 972 (2001).
[8] RAP 2.5(a); In re Marriage of Rideout, 110 Wash.App. 370, 382, 40 P.3d 1192 (2002).
[9] RCW 26.09.140.
[10] In re Marriage of Morrow, 53 Wash.App. 579, 590, 770 P.2d 197 (1989).
[11] Morrow, 53 Wash.App. at 590, 770 P.2d 197.
[12] In re Marriage of Sievers, 78 Wash.App. 287, 312, 897 P.2d 388 (1995).
[13] RAP 7.2(e).