# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Marriage of | No. 49874-0-II |
| RICHARD L. YOUNG, | |
| Respondent, | |
| and | |
| DONNA D. YOUNG, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, P.J. — Donna Young appeals the trial court's orders from the dissolution of her marriage to Richard Young. She argues that substantial evidence does not support the trial court's values for some of their assets and that the trial court abused its discretion when it did not award her permanent maintenance. We affirm.

## FACTS

### I. BACKGROUND

In 2014, after 41 years of marriage, Richard[1] filed for divorce from Donna. At the time, Richard was age 62 and Donna was age 61. They owned two businesses—Cedarlake Company, a commercial general contracting business, and CC Land Development LLC (CC Land), a holding

---

[1] For clarity, the parties will be referred to by their first names.

company. They also owned five real properties—a 40 percent interest in The Timbers at Van Mall (The Timbers interest), the family home (the Ridgefield home), a condominium (the Bend condominium), and land in Vancouver (Padden Parkway) and Bend, Oregon (the Pronghorn lot).

## II. TRIAL

### A. RICHARD'S ARGUMENT AND EVIDENCE

In June 2016, at the trial, Richard requested that the trial court award Donna only the Bend condominium out of all the parties' real properties, an offsetting lump sum payment of $471,790, and $3,500 in monthly maintenance until he had paid the lump sum in full. Richard based his request on his proposed values for community property assets, resulting in a total value of about $1.2 million and a 55/45 split of community property assets in his favor.

### 1. RICHARD'S FINANCIAL POSITION

Richard, who was age 64 at the time of trial, testified that he had been a commercial developer for 20 years and had experience buying and selling real estate for over 40 years. At least once, he had "[gone] broke" and rebuilt his business. 1 Report of Proceedings (RP) at 26. When he filed for divorce, Richard's businesses were doing poorly; business continued to be stagnant at the time of trial. His personal income was about $3,000 per month. Richard testified that he no longer wanted to be under so much stress from his businesses because he was at retirement age. He sought to sell his properties, invest the cash in "some apartments and passive investment" he could manage, and perhaps consult for another construction company. 2 RP at 288.

2.    CEDARLAKE

The parties stipulated[2] that Cedarlake, the parties' contracting business, had an appraised value of $114,000 in 2015. The appraisal took into account the value of Cedarlake's pending lawsuit against another company and other projected cash flows, as well as Cedarlake's $235,000 line of credit balance.

Without Donna's objection that Richard was bound by the stipulated value, Richard testified that since the 2015 appraisal, circumstances had decreased Cedarlake's value. Cedarlake had no current projects and had operated at a loss in the two years leading up to trial. Further, the appraisal did not take into account that a counterclaim had since been brought against Cedarlake in its lawsuit, for approximately $225,000. As a consequence, Cedarlake was unable to obtain bonding from Washington State, and Richard was unable to raise enough cash to reinstate the bonds.

Regarding the line of credit balance owed by Cedarlake during the 2015 appraisal, Richard testified that he had since repaid that balance. The funds to repay the line of credit came from a loan that Richard had taken out on Padden Parkway: the Precision Capital loan. Based on his testimony, in closing, Richard argued that Cedarlake was worth $0.

---

[2] On the first morning of trial, the parties stipulated to certain facts related to their properties' values and provided the trial court with their stipulations. They stipulated to the properties' gross values as well as the amounts of reductions from most of those values, such as commissions, closing costs, and mortgage balances for various properties. Throughout the trial, the parties repeatedly referred to these stipulations, which they did not treat as barring them from disputing whether various reductions should actually be included to arrive at net property values. For instance, during opening arguments, Donna argued that Cedarlake was worth more than its stipulated $114,000 value, without Richard objecting.

3.      RIDGEFIELD HOME

For the Ridgefield home, the parties agreed to a sales value of $1,166,680 and the amounts of various reductions, including a $238,392 line of credit balance, closing costs, and commission. They did not agree to a net value.

At trial, Richard testified that the line of credit balance should be subtracted from the home's stipulated value and that the associated funds were not used for Cedarlake.[3]  Although mortgage interest was not included in the stipulations, Richard also requested, without Donna's objection, that the trial court further reduce the home's value by about $40,000 for mortgage interest.  Richard wanted to sell the Ridgefield home in order to avoid it going into foreclosure and to raise enough cash to rent another residence.  He testified that he would be left with "[m]aybe [$]50,000" after selling the Ridgefield home.  1 RP at 108.  Based on his testimony, in closing, Richard argued that the trial court should value the Ridgefield home at $128,062.

4.      THE TIMBERS INTEREST AND 26 U.S.C. § 1031 EXCHANGES

Regarding The Timbers interest, the parties' share of a business that owned an office building at Van Mall, the parties stipulated that the interest's sale proceeds would be $2,520,000. Although they did not stipulate to the net sales proceeds from The Timbers interest, the parties agreed to the amounts of commission and closing costs, excise tax, a mortgage and associated prepayment penalty, and a loan balance.

---

[3] On this point, Donna presented conflicting evidence:  the Youngs' daughter testified for Donna that the funds from this line of credit went into Cedarlake.

The Timbers interest was listed for sale at the time of trial. Before trial, Richard received an offer proposing a 26 U.S.C. § 1031 exchange for The Timbers interest,[4] but the offer fell through. The Timbers interest was eligible to be sold in a 26 U.S.C. § 1031 exchange, so that whichever party was awarded The Timbers interest could potentially invest the proceeds from its sale into other properties and avoid capital gains taxes.

Without Donna's objection, Richard testified to additional reductions from the property's value—"Health Care Act"[5] taxes of 3.8 percent, capital gains taxes of 28 percent, and potential outstanding property taxes—that were not included in the parties' pretrial stipulations. Based upon his testimony, in closing, Richard argued that The Timbers interest's net value was $410,891.

5.    BEND CONDOMINIUM AND PRONGHORN LOT

For the Bend condominium, the parties did not stipulate to the amount of closing costs and commission. Instead, they simply stipulated that the Bend condominium had a value of $130,000, based on an appraisal. For the Pronghorn lot, the parties stipulated to a gross value of $90,000 based on an appraisal and to related amounts for commission, closing costs, and a transfer fee. At trial, Richard explained that the Pronghorn lot was empty.

Related to both the Pronghorn lot and the Bend condominium, without Donna's objection, Richard testified that since the parties' separation, he had continued to make monthly payments on a land loan secured by the Pronghorn lot and the Bend condominium. He had also paid about

---

[4] This refers to a transaction in which a taxpayer sells a property but defers capital gains taxes by purchasing another property with the sale proceeds. *See* 26 U.S.C. § 1031. Later in the trial, when the parties presented testimony about Padden Parkway's value, Richard's realtor testified that it was "difficult to find good [26 U.S.C. §] 1031 exchange properties." 3 RP at 367.

[5] "Health Care and Education Reconciliation Act of 2010," § 1402, 26 U.S.C. § 1411 (2010).

$63,000 to prevent foreclosure on the Pronghorn lot and the Bend condominium. In closing, Richard adhered to the stipulated $130,000 value for the Bend condominium but contended that the Pronghorn lot's value was -$23,817.

6. CC LAND AND PADDEN PARKWAY

The parties did not stipulate to a value for their business CC Land. Richard testified that CC Land was merely a holding company that owned most of the other properties. Based on this testimony, in closing, he argued that CC Land had no value.

For Padden Parkway, the parties stipulated to a sale value of $3,850,000 as well as the amounts of various reductions such as commission, closing costs, and excise tax and about $1.5 million for notes owed to third parties. At trial, Richard testified at length regarding another significant debt associated with Padden Parkway, the Precision Capital loan, which had an outstanding balance of $1,162,441. In order to profit from Padden Parkway, Richard had to either sell the property quickly or sell at least 12 lots of the property. According to Richard, taking into account all of the debts and costs associated with selling Padden Parkway, its net value would be about $300,000.[6]

---

[6] Richard initially testified that the net value was $500,000. However, upon Donna's request, the trial court allowed an additional two days of evidence on Padden Parkway's value. During these two days, Richard presented his realtor's testimony that the listing price to sell Padden Parkway as a whole had been increased to $4.95 million, based on right-of-way improvements. Richard explained that the increase in value was accompanied by corresponding cost increases and that his figures assumed that he could find a purchaser relatively soon. If he could not quickly sell Padden Parkway, the Precision Capital loan amount would increase to $2,695,000, and Richard would have to begin selling Padden Parkway in lots, incurring additional construction and maintenance costs and property taxes. In that case, Richard would stand to make $310,000 from Padden Parkway.

### B. DONNA'S ARGUMENT AND EVIDENCE

At trial, Donna requested $5,000 in monthly, permanent maintenance and that she be awarded The Timbers interest, the Pronghorn lot, and the Bend condominium. She argued that Cedarlake was worth the appraised value of $114,000, the Ridgefield home was worth $171,598, The Timbers interest was worth $601,051, and the Bend condominium was worth $128,395. And she argued that the net value for the Pronghorn lot was $72,736 and for Padden Parkway was no less than $1.3 million but agreed with Richard that CC Land had no value.

To compensate for her proposed property division awarding Richard the majority of the parties' assets' value, which Donna argued was about $2 million, Donna requested that Richard pay her an equalizing judgment of $308,221. To incentivize Richard's payment of the equalizing judgment, Donna proposed that Richard pay half of the equalizing judgment at a time, with corresponding decreases in monthly maintenance.

Donna explained that she had not worked outside the home for 20 years and before that she had worked only intermittently at minor retail positions. At the time of trial, she lived in the Bend condominium, which was listed for sale. Donna provided little testimony about property values, although she contended that the parties' standard of living had remained steady until their separation. The parties' daughter also testified for Donna that Richard had used the Ridgefield home line of credit funds for Cedarlake.

### III. PROPERTY DISTRIBUTION AND SPOUSAL MAINTENANCE

Following trial, the trial court found that the parties' properties and businesses had the following values: the Ridgefield home, $149,000; the Bend condominium, $130,000; The Timbers interest, $410,000; Padden Parkway, $500,000; the Pronghorn lot, $72,000; Cedarlake, $0; and

7

CC Land, $0. The trial court awarded the Ridgefield home, Padden Parkway, The Timbers interest, Cedarlake, and CC Land to Richard and the Pronghorn lot and Bend condominium to Donna.

The trial court also ordered Richard to pay Donna an equalizing judgment of $435,625[7] and to obtain a life insurance policy naming Donna as the beneficiary in order to secure spousal support. Richard had to pay the equalizing judgment in three annual installments ending in 2019 and had to pay interest if his payments were delinquent. The trial court additionally ordered Richard to pay delinquent maintenance of $34,033 and attorney fees of $10,000.

Related to spousal support, the trial court entered the following findings and conclusions:

Spousal support should be ordered because the court has considered the factors enumerated in RCW 26.09.090, including but not limited to the following facts:
This is a long term marriage of 43 years.
Husband is 64 years old and wife is 63 years old.
The court presumes that Husband will pay the $435,625 money judgment he owes to Wife in a timely fashion as detailed in the Final Divorce Order and the amount and duration of maintenance relies on that presumption.
The standard of living during the marriage given that both parties have their own houses and so forth.

Clerk's Papers (CP) at 116. The trial court awarded Donna $4,500 in monthly support for 40 months, ending in 2020, if Donna remarried, or if either party died. The trial court also incentivized Richard to timely pay the equalizing judgment by tying payment to reductions in spousal support. Support would be reduced to $3,500 per month if Richard timely paid the first installment, to $2,500 if Richard timely paid the second installment, and to $1,500 if Richard timely paid the third installment. Donna appeals the trial court's dissolution orders.

---

[7] After valuing and dividing the property, the trial court subtracted Donna's award of community property assets from Richard's awarded share and then ordered Richard to pay Donna half the difference. Thus, the trial court split the community property assets' value equally between the parties.

No. 49874-0-II

## ANALYSIS

### I. STANDARDS OF REVIEW

We review determinations in dissolution proceedings regarding property division and maintenance awards for a manifest abuse of discretion. *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005); *In re Marriage of Valente*, 179 Wn. App. 817, 822, 320 P.3d 115 (2014). A decision is an abuse of discretion if it is manifestly unreasonable or based on untenable grounds or reasons. *Muhammad*, 153 Wn.2d at 803.

We review factual findings in a dissolution proceeding, such as the value of community assets, for substantial evidence. *In re Marriage of Wilson*, 165 Wn. App. 333, 340, 267 P.3d 485 (2011); *In re Marriage of Gillepsie*, 89 Wn. App. 390, 404, 948 P.2d 1338 (1997). Substantial evidence is that which is sufficient to persuade a rational, fair-minded person of the finding's truth. *Wilson*, 165 Wn. App. at 340. We do not substitute our judgment for the trial court's judgment, reweigh the evidence, or evaluate witness credibility. *Wilson*, 165 Wn. App. at 340. Thus, so long as substantial evidence supports a finding, it is immaterial that other evidence may contradict it. *In re Marriage of Burrill*, 113 Wn. App. 863, 868, 56 P.3d 993 (2002).

### II. PROPERTY VALUES

Donna challenges the trial court's valuation of several community assets. We address her three arguments in turn, below.

### A. CEDARLAKE

First, the parties dispute whether substantial evidence supports the trial court's finding that Cedarlake had a $0 value, despite the parties' pretrial stipulation that Cedarlake had an appraised value of $114,000 in 2015. We hold that substantial evidence supports the finding.

9

On the first day of trial, the Youngs stipulated that Cedarlake had a value of $114,000 based on a 2015 appraisal. The appraisal increased Cedarlake's value by a lawsuit against another company, worth $63,000, and other projected cash flows and decreased Cedarlake's value by a $235,000 line of credit balance.

At trial, Richard testified that Cedarlake's business was stagnant, that the company had no current projects, and that it had operated at a loss since 2015. After the 2015 appraisal, a counterclaim was brought against Cedarlake; Richard estimated the counterclaim's amount as $225,000.[8] As a consequence of the counterclaim, Cedarlake was unable to obtain bonding in Washington State. Richard stated that he did not have enough cash to pay to reinstate the bonds. Donna did not object to this testimony on the basis of the pretrial stipulations.

Richard's testimony that Cedarlake operated at a loss, was "stagnant," and had lost bonding as a result of the counterclaim brought in its lawsuit supported the trial court's finding that Cedarlake had no value. There was accordingly substantial evidence to find that later events reduced the 2015 appraised value to zero.

Donna argues that if anything, the trial court should have increased Cedarlake's value above the 2015 appraised value based on projected cash flows. But the 2015 appraisal already

---

[8] Donna challenges this testimony's credibility, arguing that Richard's value was mere speculation. But Richard testified that Cedarlake was "hearing numbers that they're estimating around $225,000," and on appeal, we do not review the trial court's decision to accept this testimony as credible. 1 RP at 34; *Burrill*, 113 Wn. App. at 868. Further, even without taking into account the counterclaim's value, Richard's testimony that Cedarlake was stagnant and had lost bonding was ample evidence to support that it had no value.

took into account projected cash flows. Thus, Donna's argument fails as a reason to increase Cedarlake's value.[9]

In a separate argument that the trial court undervalued Cedarlake, Donna points out that Richard later paid the line of credit balance that the appraisal used to reduce Cedarlake's value. She claims that the trial court failed to account for this increase in value. But Donna overlooks that an increase in Cedarlake's value from paying off the line of credit would be accompanied by a corresponding increase in debt associated with Padden Parkway, which was awarded to Richard. The trial court awarded both Cedarlake and Padden Parkway to Richard. Accordingly, because a corresponding decrease in Padden Parkway's value accompanied any increase in Cedarlake's value above the appraised amount, her argument fails.

We hold that substantial evidence supports the trial court's finding that Cedarlake had no value at the time of trial.

## B. RIDGEFIELD HOME AND THE TIMBERS INTEREST

Next, Donna argues that substantial evidence does not support the trial court's values for the Ridgefield home, $149,000, and The Timbers interest, $410,000. We hold that Donna's arguments fail.

Before trial, the parties stipulated to the Ridgefield home's and The Timbers interest's sales values, as well as the amounts of various reductions. If the trial court accepted all the reductions, including a $238,392 line of credit balance, the Ridgefield home would be left with a net value of

---

[9] Donna's reliance on *Valente* to argue that she is not double counting cash flows is misplaced. That case addresses what constitutes a "double dip" into the same asset when dividing property and awarding maintenance and is not applicable on this issue. *Valente*, 179 Wn. App. at 829-30.

11

about $171,000. At trial, Richard testified that the Ridgefield home's value was further reduced by $40,000 in mortgage interest. Thus, there was substantial evidence to support the trial court's $149,000 value for the Ridgefield home.

Donna argues that the trial court should not have included the $238,392 line of credit balance to reduce the Ridgefield home's value. She relies on the Youngs' daughter's testimony that the line of credit funds were used for Cedarlake. But her argument overlooks that as long as substantial evidence supports a finding, it is immaterial that other evidence may contradict it. *See Burrill*, 113 Wn. App. at 868. Richard testified that he did not use any of the Ridgefield home line of credit funds for Cedarlake. Accordingly, Donna's argument fails.

Related to The Timbers interest, the parties stipulated before trial that they would receive $2,520,000 if The Timbers was sold (40 percent of the stipulated sales price of $6,300,000). They also stipulated to the amount of certain reductions, including closing costs, excise tax, and commission, which, if subtracted from The Timbers interest's stipulated sale proceeds, would result in a net value of about $601,100. At trial, Richard testified that The Timbers was listed for sale and that another company had made an offer and proposed a 26 U.S.C. § 1031 exchange but then decided to purchase a different property. In addition to the expenses listed in the stipulation, Richard testified that when The Timbers sold, "Health Care Act" taxes of 3.8 percent, capital gains taxes of 28 percent, and any outstanding property taxes would be paid from the proceeds. 1 RP at 59. Donna did not object to Richard's testimony about additional, nonstipulated reductions.

The parties' pretrial stipulations and Richard's testimony about Health Care Act and capital gains taxes support the trial court's finding that The Timbers interest's net value was $410,000. Although Donna argues that capital gains taxes should not have been included because they could

be avoided through a 26 U.S.C. § 1031 exchange, Richard testified that a previous offer involving a 26 U.S.C. § 1031 exchange had fallen through. Further, Richard's realtor later testified that it was difficult to find eligible properties for 26 U.S.C. § 1031 exchanges. Thus, the evidence was such that a rational person would not have been persuaded to assume that Richard could engage in a 26 U.S.C. § 1031 exchange, and there is substantial evidence to support inclusion of capital gains taxes to reduce The Timbers interest's value.

### C. BEND CONDOMINIUM

Donna argues that substantial evidence does not support the trial court's $130,000 value for the Bend condominium because the trial court failed to include costs of sale, despite having included costs of sale in the Ridgefield home's value. We disagree and hold that substantial evidence supports not reducing the Bend condominium's value by costs of sale.

The parties stipulated to a $130,000 value for the Bend condominium; their stipulations did not include stipulated costs of sale or commission for this property. For her part, Donna testified that she wished to be awarded the Bend condominium, where she lived. Richard, on the other hand, sought to sell his properties in order to retire. He testified that he would have the Ridgefield home on the market "tomorrow" if he could and would sell it as quickly as possible. 1 RP at 109. In light of this testimony, substantial evidence supports the trial court's finding that the Bend condominium had a value of $130,000, without reducing that value by projected sales costs. Further, the trial testimony also supports the trial court's decision to reduce Richard's, but not Donna's, residence's value by costs of sale because Richard, but not Donna, testified that he intended to sell his residence.

### D. CONCLUSION

Donna's challenges to the trial court's findings of fact regarding Cedarlake's, the Ridgefield home's, The Timbers interest's, and the Bend condominium's values either rely on challenges to Richard's testimony's credibility or overlook other, contrary trial evidence. Accordingly, Donna's challenges fail. The trial court's factual findings regarding these properties' values are supported by substantial evidence and are affirmed.

### III. SPOUSAL MAINTENANCE

Donna raises three arguments that the trial court erred when it denied her request for permanent maintenance and instead awarded her monthly maintenance of $4,500 for 40 months, subject to reduction if Richard timely paid the monetary judgment installments. We address and reject her arguments below.

### A. LEGAL PRINCIPLES

"Maintenance is 'a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time.'" *Valente*, 179 Wn. App. at 821 (quoting *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152 (1984)). RCW 26.09.090(1) states,

> The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to misconduct, after considering all relevant factors including but not limited to:
> (a) The financial resources of the party seeking maintenance, including separate or community property apportioned to [her], and [her] ability to meet [her] needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to [her] skill, interests, style of life, and other attendant circumstances;
> (c) The standard of living established during the [marriage];
> (d) The duration of the [marriage];
> (e) The age, physical and emotional condition, and financial obligations of the [spouse] seeking maintenance; and

(f) The ability of the [spouse] from whom maintenance is sought to meet [his] needs and financial obligations while meeting those of the [spouse] seeking maintenance.

"The only limitation on the amount and duration of maintenance under RCW 26.09.090 is that the award must be 'just.'" *In re Marriage of Wright*, 179 Wn. App. 257, 269, 319 P.3d 45 (2013).

## B. CONSIDERATION OF ALL RELEVANT FACTORS

First, Donna argues that the trial court failed to consider "all" relevant factors under RCW 26.09.090, particularly Donna's ability to meet her needs independently. RCW 26.09.090(1)(a). We disagree.

The trial court must consider all of the nonexclusive factors set forth in RCW 26.09.090. *Washburn*, 101 Wn.2d at 179. But so long as the trial court considers each factor, it need not make specific factual findings on each factor. *In re Marriage of Mansour*, 126 Wn. App. 1, 16, 106 P.3d 768 (2004). And we may utilize a trial court's consistent oral opinion to clarify its formal findings of fact. *In re Marriage of Yates*, 17 Wn. App. 772, 773, 565 P.2d 825 (1977).

In its written findings and conclusions, the trial court stated that it had considered "the factors enumerated in RCW 26.09.090," including the length of the marriage, the parties' ages, the presumption that Richard would pay the equalizing judgment, and the parties' standard of living during the marriage. CP at 116. The trial court was not required to enter written findings on each factor but had to consider each factor. *Mansour*, 126 Wn. App. at 16. And as the written findings state, the trial court did so.

In addition to its written findings, the trial court's oral ruling includes an express statement that the trial court took into consideration its duty to put the parties in roughly equal positions for the remainder of their lives. Thus, Donna is incorrect that the trial court failed to consider her

15

financial situation. For these reasons, Donna's argument that the trial court's analysis under RCW 26.09.090 was inadequate fails.

## C. FAILURE TO AWARD PERMANENT MAINTENANCE

Donna next argues that the trial court abused its discretion when it failed to award her "[permanent] maintenance secured by a life insurance policy." Br. of Appellant at 26. She contends that the trial court failed to account for the disparity between her and Richard's earning power, the requirement of equalizing the parties' future economic circumstances, and the marriage's length. We hold that the trial court was within its discretion to deny Donna's request for permanent maintenance.

Although permanent maintenance is disfavored, it may be appropriate if the party seeking maintenance will not be able to significantly contribute to her own livelihood. *Valente*, 179 Wn. App. at 822. When determining issues of maintenance and property division, a paramount concern is the parties' post-dissolution economic position. *In re Marriage of Vander Veen*, 62 Wn. App. 861, 867, 815 P.2d 843 (1991). "[W]here . . . the disparity in earning power and potential is great, [we] must closely examine the maintenance award to see whether it is equitable in light of the post dissolution economic situations of the parties." *In re Marriage of Sheffer*, 60 Wn. App. 51, 56, 802 P.2d 817 (1990).

Here, although Donna requested permanent maintenance, the trial court instead awarded Donna monthly support of $4,500 for 40 months, secured by a life insurance policy. The trial court also unequally divided the parties' assets and ordered Richard to pay Donna an equalizing judgment. The record shows that the trial court made its decision after considering the duration of the parties' marriage, their ages, and their relative financial prospects. By evenly distributing the

16

value of the parties' assets and ordering Richard to pay 40 months of maintenance, the trial court endeavored to leave the parties in similar post-dissolution economic situations. The trial court also attempted to achieve a just result: both providing Donna with immediate cash to support herself and giving Richard time to liquidate the value of the properties awarded to him.[10]

Donna argues that her lack of work history and inability to generate income required permanent maintenance. She points to Richard's decades of experience buying and selling real estate, including recovering at least once after "[going] broke." 1 RP at 26. In contrast, Donna had not worked outside the home for 20 years and before that had worked only intermittently at minor retail positions.

But Donna's argument minimizes Richard's testimony that his financial situation was dire, his income was reduced to approximately $3,000 per month, and he was unable to raise enough cash even to produce the $24,000 necessary to reinstate his bonding. Richard, who was age 64 at the time of trial, testified that he no longer wished to be under so much stress from his businesses now that he was at retirement age. He sought to sell his properties, invest the cash in "some apartments and passive investment" he could manage, and perhaps consult for another construction

---

[10] In her reply, Donna implies that the trial court abused its discretion because it disparaged Donna's contributions to the marriage as a homemaker. She refers to the following part of the trial court's oral ruling:

> [T]here are consequences to being married that long [43 years] and then getting a divorce. . . . And the parties are about to suffer the consequences of a long-term marriage where particularly one party did most of the work and the other party stayed home most of the time. And I won't belabor that point, but that's where we're at.

4 RP at 492. Contrary to Donna's argument that the trial court denigrated her marital contributions, the trial court's ruling reflects the difficulty of leaving the parties in equal financial positions under the circumstances, particularly where neither had much income-generating prospects.

17

company.  2 RP at 288.  Although Donna downplays this testimony, the trial court expressly found it credible—a finding we do not review on appeal.  *Burrill*, 113 Wn. App. at 868.  Thus, *both* spouses' post-dissolution economic situations were bleak.  Contrary to Donna's arguments, Richard was not left with a "prosperous" economic future while Donna's prospects were dire.

Based on her premise that the trial court's maintenance award left her and Richard with disparate financial prospects, Donna relies upon cases holding that following a long-term marriage, the focus should be upon equalizing the parties' financial positions.[11]  She is correct that the maintenance award should be used to equalize disparate post-dissolution earning potentials when a long-term marriage is dissolved.  *See In re Marriage of Bulicek*, 59 Wn. App. 630, 633-36, 800 P.2d 394 (1990); *Sheffer*, 60 Wn. App. at 57; *Stacy v. Stacy*, 68 Wn.2d 573, 576, 414 P.2d 791 (1966).  But she overlooks that, as set forth above, this was not a situation where the parties had significantly disparate earning potentials and that the trial court endeavored to equalize the parties' post-dissolution financial positions by evenly distributing the value of the parties' assets.

Permanent maintenance is not automatically appropriate following the dissolution of a long-term marriage, even when the party requesting maintenance has minimal work history.  *See In re Marriage of Mathews*, 70 Wn. App. 116, 118-20, 125, 853 P.2d 462 (1993) (reversing a permanent maintenance award even though the wife had sacrificed her ability to be employed in

---

[11] None of these cases' holdings actually required permanent maintenance to be imposed.  *See In re Marriage of Bulicek*, 59 Wn. App. 630, 634-36, 800 P.2d 394 (1990) (affirming maintenance to the wife until the husband's retirement); *Sheffer*, 60 Wn. App. at 57-58 & n.2 (reversing and remanding an inadequate, three-year maintenance award but not directing any particular duration for maintenance on remand); *Stacy v. Stacy*, 68 Wn.2d 573, 577, 414 P.2d 791 (1966) (increasing the amount, but not duration, of a five-year maintenance award).  Donna relies on these cases for the general principle that a trial court abuses its discretion when it fails to take into account the parties' future earning capacities when entering maintenance following a long-term marriage.

order to raise a family during the marriage). The paramount concern is the economic position in which the dissolution will leave *both* parties. *Vander Veen*, 62 Wn. App. at 867. Here, the trial court properly took into consideration both parties' economic prospects, namely, that the parties were both retirement age, that Richard's businesses were failing and he would imminently retire from active work, and that Donna had minimal work history outside the home. Accordingly, the trial court divided the value of the parties' community property equally and awarded Donna maintenance for 40 months. We hold that in doing so, the trial court did not abuse its discretion.

### D. "ILLUSORY" JUDGMENT

Donna also argues that the trial court abused its discretion because it failed to take into consideration that Richard could simply refuse to pay the monetary judgment, making it "illusory." We disagree that the trial court abused its discretion.

After distributing the parties' assets, the trial court ordered Richard to pay Donna $435,625 in three equal installments. The trial court awarded Donna a lien against "all property (real and personal) awarded to [Richard] in this Final Divorce Order for all due unpaid money judgments owed to her by [Richard]."[12] CP at 126. It also incentivized Richard to pay the money judgment by decreasing maintenance if Richard made timely payments on the judgment.

Thus, contrary to Donna's arguments, the trial court did take into consideration that Donna's economic security was dependent on Richard paying the judgment. It awarded Donna maintenance over the entire period that Richard was to pay the money judgment installments and

---

[12] Richard objected to this language on the basis that it would hamper his ability to sell the properties awarded to him in order to pay the judgment. The trial court ordered Richard and Donna to come to an agreement on the issue before the next hearing. However, neither party brought the issue up again at the next hearing, and the final order contains this language.

tied the money judgment's payment to decreases in maintenance to incentivize Richard to pay the judgment. And the final order granted Donna a lien against the property awarded to Richard should he fail to pay the money judgment. In doing so, the trial court did not abuse its discretion.

## IV. ATTORNEY FEES

Donna requests her appellate attorney fees under RAP 18.1 and RCW 26.09.140 and substantiates her request with a timely financial declaration. We deny Donna's request.

RAP 18.1 authorizes an appellate attorney fees award if allowed by applicable law. "Upon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs." RCW 26.09.140.

Under RCW 26.09.140, we consider the issues' arguable merit on appeal and the parties' financial resources. *In re Marriage of Raskob*, 183 Wn. App. 503, 520, 334 P.3d 30 (2014). If an appeal is "essentially factual in nature" and does "not present any issue upon which reasonable minds could differ," it lacks arguable merit. *See Thompson v. Thompson*, 34 Wn. App. 643, 648, 663 P.3d 164 (1983).

Donna's appeal is factual in nature. It relies upon challenges to whether the evidence supports the trial court's factual findings[13] and to the trial court's exercise of its discretion in fashioning the maintenance award. Her appeal lacks arguable merit and for this reason, her request for appellate attorney fees is denied.

---

[13] For instance, Donna argues a lack of substantial evidence to support the trial court's failure to include a potential 26 U.S.C. § 1031 exchange's effects when it determined The Timbers interest's value. But Donna did not provide any evidence about 26 U.S.C. § 1031 exchanges. Instead, she attacks the trial court's decision to believe the testimony presented by Richard that a previous offer involving a 26 U.S.C. § 1031 exchange had fallen through and that it was difficult to find 26 U.S.C. § 1031 exchange properties. Thus, her argument rests on a challenge to the trial court's credibility determination, which we do not review on appeal. *See Wilson*, 165 Wn. App. at 340.

No. 49874-0-II

We affirm the trial court and deny Donna's request for appellate attorney fees.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, P.J.

We concur:

BJORGEN, J.

SUTTON, J.