IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Marriage of FRANK YOUNG JR., | No. 82190-3-I |
| Respondent/Cross Appellant, | |
| and | UNPUBLISHED OPINION |
| AGUNG AYU YOUNG, | |
| Appellant/Cross Respondent. | |

BOWMAN, J. — Agung Ayu Young appeals from orders the trial court issued when it dissolved her 12-year marriage. She challenges several of the trial court's findings of fact, its distribution of the community portion of her retirement account, its child support order, and its denial of her request for attorney fees. Frank Young Jr. conditionally cross appeals should we remand on any of Agung's[1] claims. Finding no reversible error, we affirm.

FACTS

Agung and Frank met in the summer of 2006. At the time, Agung worked as a phlebotomist at Puget Sound Blood Center.[2] She owned a rental property in Bali, Indonesia, and had a retirement account through her employer. Frank had retired from working as a crew coordinator for Seattle City Light. He received a

_____

[1] We refer to Agung Ayu Young and Frank Young Jr. by their first names for clarity. We mean no disrespect.

[2] In 2015, Puget Sound Blood Center became Bloodworks Northwest.

Citations and pin cites are based on the Westlaw online version of the cited material.

pension and had a city of Seattle deferred compensation plan (DCP) as well as an individual retirement account (IRA). Frank also owned several properties. He had a house in Seattle, a rental property with three apartment units and one office space in West Seattle, and an undeveloped parcel of land in Skagit County.

In December 2006, the parties moved in together. They married in January 2008. A month after marrying, the parties' first daughter was born. Their second daughter was born in 2009.

The parties did not open a joint bank account. During the marriage, Frank had at least one separate account in which he deposited his pension and rental income. Frank paid for insurance, taxes, utilities, maintenance, and other costs related to the Seattle and West Seattle properties from his separate bank account. Agung had two separate bank accounts. In one, she deposited rent from her Bali property. In the other, she deposited her paychecks.

Though Frank and Agung maintained separate bank accounts, they shared financial responsibility for maintaining the household. Frank paid for housing and car costs while Agung paid for groceries, health insurance for the children, and uninsured medical expenses. That financial arrangement allowed Agung to maximize her retirement contributions.

In 2013, Frank and Agung bought a piece of land in Grant County. They never developed the property. In June 2019, the couple bought a house in Kent. In early September 2019, Agung withdrew $24,000 from accounts the couple established for their children and applied the funds to the principal on the Kent

house.  Less than a month later, in late September 2019, the couple separated and Frank petitioned to dissolve their marriage.

The five-day trial began in August 2020.  On November 10, 2020, the trial court entered a final dissolution decree, final parenting plan, final child support order and worksheets, and "Findings and Conclusions about a Marriage."  The court used the standard form to issue its Findings and Conclusions about a Marriage but also included "Attachment A," which listed additional findings of fact 1 through 35 and conclusions of law 36 through 93.  The court also referenced "Exhibit 1" in its findings and conclusions, which it attached to Attachment A.  Exhibit 1, titled "Young Asset Sheet," is an Excel spreadsheet that lists the values of Agung and Frank's assets and debts and their separate and community property.

The trial court found that Frank and Agung were in a committed intimate relationship (CIR) by April 2007 and married in January 2008.  It characterized the Seattle house as Frank's separate property but found that $73,307 of the value was Agung's separate property based on a payment she made to satisfy its mortgage in 2009.  It also determined that the West Seattle rental, the undeveloped Skagit County land, two bank accounts, several vehicles, and Frank's pension, DCP, and IRA were Frank's separate property.  The court characterized as Agung's separate property the Bali rental and the pre-CIR portion of her retirement account.  The court awarded each party their separate property.  In total, the court awarded Frank $1,848,222 and Agung $211,274 in separate property.

3

The court characterized the Grant County land and the Kent house as community property, which it then awarded to Agung. It valued the Kent house at $465,500 subject to a $385,000 mortgage, leaving $80,500 in equity. The court also characterized as community property the rest of Agung's retirement account, awarding 35 percent to Frank and 65 percent to Agung.[3] In total, the court awarded Frank $209,118 and Agung $467,653 in community property.

The court issued a parenting plan under which the children reside with Frank 213 nights per year and with Agung 152 nights per year.[4] It ordered child support based on the standard calculation, requiring Agung to make a monthly transfer payment of $1,079.66. Agung asked for attorney fees, which the court denied, finding that "neither party has the ability to pay the other party's attorney's fees."

Both parties moved for reconsideration. Frank sought reconsideration of the court's characterization of Agung's mortgage payment on the Seattle house as her separate property. Agung sought reconsideration of her child support obligation, arguing for the first time that the court should deviate from the standard child support calculation because of the substantial amount of residential time it awarded her in the parenting plan. She also sought reconsideration of several property division findings, arguing insufficient evidence

---

[3] The court also valued and distributed several vehicles, a gun collection, several BECU (Boeing Employees' Credit Union) bank accounts, and credit card debt. Neither party challenges those distributions on appeal.

[4] The children reside with Agung on the first, third, fourth, and any fifth weekend each month.

supports them, as well as the court's denial of her request for attorney fees. The court denied Frank's motion but it did not rule on Agung's motion.

Agung appeals. Frank "conditionally cross-appeals," asking us to consider his assignments of error only if we remand on any of Agung's claims.

ANALYSIS

Agung challenges several of the trial court's findings of fact, its distribution of the community portion of her retirement account, its failure to deviate from the standard child support calculation, and its denial of her request for attorney fees.

I. Findings of Fact

Agung argues that substantial evidence does not support four of the trial court's findings of fact. We will "uphold a finding of fact if substantial evidence exists in the record to support it." In re Marriage of Burrill, 113 Wn. App. 863, 868, 56 P.3d 993 (2002). Evidence is substantial if it exists in a sufficient quantum to persuade a fair-minded person of the truth of the declared premise. Id. So long as substantial evidence supports the finding, it does not matter that other evidence may contradict it. Id. We leave credibility determinations to the trier of fact and do not review them. Id.

A. Finding of Fact 15

In its finding of fact 15 in Attachment A to the Findings and Conclusions about a Marriage, the trial court found that the Kent house "purchase price was $465,500" and its "value is $465,500." Agung contends that no substantial evidence supports the trial court's finding that the "purchase price" of the Kent house was $465,500.

The record shows conflicting evidence about the purchase price of the Kent house. Agung's loan application lists the purchase price as $460,000. The King County tax assessor's website shows the purchase price was $456,500. Agung also testified that the purchase price was $456,500. In her answers to interrogatories, Agung listed the purchase price as $465,500. But the court did not admit those interrogatories as evidence at trial. As a result, substantial evidence does not support the trial court's finding that the purchase price of the Kent house was $465,500.

Even so, "an erroneous finding of fact not materially affecting the conclusions of law is not prejudicial and does not warrant reversal." Skagit County Pub. Hosp. Dist. No. 1 v. Dep't of Revenue, 158 Wn. App. 426, 449, 242 P.3d 909 (2010). For the purpose of property distribution, the relevant value of the house was the value at dissolution, not what the parties purchased it for. And the trial court used the value at the time of dissolution in its award of property. Agung does not challenge the trial court's determination in finding of fact 15 that the "value" of the Kent house at dissolution was $465,500. Nor does she assign error to conclusion of law 61 where the court reaches the same conclusion ("The Court awards Respondent the . . . home in Kent, which has a value of $465,500 subject to the mortgage."). Because Agung fails to show that the erroneous finding about the purchase price of the Kent house materially affected the court's conclusion on its value at dissolution, the error does not warrant reversal.

B.  Finding of Fact 17

Agung argues that no substantial evidence supports the finding that her withdrawal of $24,000 from the children's accounts "was a pre-distribution that occurred after the parties separated."

In its finding of fact 17 in Attachment A, the trial court found that Agung withdrew $24,000 from accounts the parties created on behalf of their children without Frank's consent.  It ordered Agung repay the funds, "or if the funds are no longer available, the Court will deem those withdrawn funds a predistribution to the mother."  Agung does not dispute that she unilaterally withdrew the funds. Instead, she argues that the withdrawal was not a predistribution because the bank statements for the children's accounts show that she withdrew the money before the parties separated.  But the trial court made no findings about when Agung withdrew the money.  And as much as Agung suggests the trial court erred as a matter of law in assigning the debt to her as a predistribution, she offers no authority in support of her argument, so we do not reach it.  See RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (When an appellant provides no authority in support of her proposition, we need not consider it.)

C.  Wire Transfers

Agung argues that no substantial evidence supports the trial court's assignment to her of unpaid accounts receivable for three wire transfers she made to family from community assets.  The trial court did not issue findings of fact about the transfers.  But the court assigned the wire transfers to Agung as

accounts receivable in the Young Asset Sheet.[5] So we treat the assignment as a finding that we review for substantial evidence.

Agung testified that she loaned $17,000 of community funds to her brother in Bali to add a bedroom onto his house for their ill father. She said that her brother already repaid that loan and that the parties used the money for vacation. According to Agung, her brother returned the money over three trips the family made to Bali by withdrawing cash from an ATM.[6] Frank testified that he opposed the $17,000 transfer. But he did not testify about whether Agung's brother repaid the debt. Because uncontroverted testimony in the record shows that Agung's brother repaid the $17,000 wire transfer to the community, substantial evidence does not support assignment of the wire transfer to Agung as an unpaid account receivable.

Agung testified that she later transferred $9,000 of community funds to her family as a gift to cover funeral expenses for her father. She testified that she and Frank agreed to send the money so they could avoid making two trips to Bali for her father's funeral—"one for cremation and the second one for . . . picking up the holy spirit from the ocean." By sending the money, they could complete the ceremony in one trip and save about $5,000 on airfare. Frank testified that he had no recollection of the $9,000 transfer. Because the only evidence in the record is that the wire transfer was a gift, substantial evidence does not support assignment of the wire transfer to Agung as an unpaid account receivable.

---

[5] Exhibit 1 of Attachment A to the trial court's Findings and Conclusions about a Marriage.

[6] Automated teller machine.

Lastly, Agung testified that she wired $5,000 of community funds to her niece to pay taxes for her house in Bali. Frank testified Agung sent the $5,000 to one of her nephews for legal fees over his objection. We defer to the trial court on issues of credibility. In re Marriage of Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999). And no testimony established that anyone repaid the money to the community. Substantial evidence supports the trial court's assignment of this wire transfer to Agung as an unpaid account receivable.

While substantial evidence does not support the assignment of the $17,000 and $9,000 wire transfers to Agung as assets, we need not reverse if the trial court's decree, despite such an error, was otherwise fair, just, and equitable. In re Marriage of Brady, 50 Wn. App. 728, 432, 750 P.2d 654 (1988); In re Marriage of Pilant, 42 Wn. App. 173, 181, 709 P.2d 1241 (1985). The trial court valued the community estate at $676,771 in its entirety.[7] The court awarded Agung 69 percent of those assets, or $467,653. Excluding the two improperly characterized wire transfers, the community property is worth $650,771 and Agung's award is $441,653. The recalculated award to Agung amounts to 68 percent of the community estate. Excluding the erroneous accounts receivable, the trial court's award is still fair and equitable and we need not reverse.

---

[7] We note that the Young Asset Sheet values the total community estate at $673,464. But based on the amounts awarded to each party ($467,653 plus $209,118), the total value equals $676,771.

D.  Finding of Fact 90

In its finding of fact 90,[8] the trial court found that Frank "does not have any net rental income" from his West Seattle property "after deducting business expenses" from rent payments.  Agung argues that substantial evidence does not support the court's finding that Frank has no income from the West Seattle rental.

Agung first argues that there is no evidence the West Seattle property expenses exceeded the rental income in 2020.  Frank testified that the property was built in 1926 and had four units, three of which he rented out in 2020 for a total of $4,000 per month.  But Frank also testified that he incurred expenses related to the units and that his federal tax returns reflected the expenses and lost income.  Tax returns from 2015 to 2018[9] show the rental had a net loss.  Substantial evidence supports the finding that historically, the rental unit did not net proceeds.

Agung next argues it was error for the court "to assume" that the rental would also net no income in 2020.  But at trial, Frank testified about major upcoming repairs needed on the West Seattle rental.  According to Frank, the building's plumbing is "old" and has "gotten to the place where it just needs to be repiped."  And because it is a commercial building, the plumbing "all has to be redone in steel, which takes pipe threaders and it's a pretty elaborate process."  To do that, Frank testified that he will likely need to vacate the building.  Given

---

[8] The trial court labeled this as a conclusion of law.  We treat findings erroneously described as conclusions of law as findings of fact.  Willener v. Sweeting, 107 Wn.2d 388, 394, 730 P.2d 45 (1986).

[9] We note that the trial court's finding references Frank's "2015 to 2019 tax returns."  But his 2019 tax return is not in the appellate record.  It appears the court considered Frank's 2019 tax return as "Exhibit 1" at trial for identification purposes only and did not admit it.

Frank's testimony about upcoming repairs, substantial evidence supports the court's finding in relation to rental income for 2020.

Lastly, Agung argues that she offered evidence showing unaccounted for rental income from 2017 to 2019. But again, it is the trial court's responsibility to resolve issues of conflicting evidence, and so long as substantial evidence supports the finding, we will affirm even if other evidence may contradict it. Burrill, 113 Wn. App. at 868. The tax documents and Frank's testimony amount to substantial evidence that support the finding.

II. Property Distribution

Agung argues that the court abused its discretion by awarding Frank 35 percent of her retirement account given the disparity between the parties' community and separate property awards. We disagree.

A trial court in a dissolution proceeding must make a "just and equitable" distribution of property. RCW 26.09.080. In doing so, it must consider all relevant factors, including (1) the nature and extent of the community property, (2) the nature and extent of the separate property, (3) the duration of the marriage, and (4) the economic circumstances of each party at the time of the property division. RCW 26.09.080. While the property division must be just and equitable, it need not be equal. In re Marriage of Larson, 178 Wn. App. 133, 138, 313 P.3d 1228 (2013). Because trial courts are "in the best position to determine what is fair, just, and equitable," we give them "broad discretion." In re Marriage of Wallace, 111 Wn. App. 697, 707, 45 P.3d 1131 (2002). We will not disturb a trial court's award absent a showing that it abused its discretion. Id. "A court

abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or for untenable reasons." Id.

When distributing the community portion of Agung's retirement account, the court considered Frank's substantial pension income, his DCP income, and his ability to earn future rental income from his West Seattle property. It also considered the parties' financial arrangement during the marriage that allowed Agung to maximize contributions to her retirement plan with community assets. The court recognized that Agung "is in a significantly inferior economic position in light of [Frank]'s considerable separate property" but also acknowledged that Agung has "many years" of contributions ahead of her to prepare for retirement.[10] Balancing those factors, the court determined that a 35/65 split of the retirement plan in Agung's favor was appropriate. That was not an abuse of discretion.

III. Child Support

Agung asserts the trial court erred by declining to deviate from the standard child support calculation. But the record shows Agung did not argue for a deviation at trial. Instead, she requested a deviation for the first time in her motion for reconsideration.[11] In her motion to reconsider, Agung argued, "Based on the facts presented at trial and based on the Court's Parenting Plan, it would be a substantial injustice not to award a deviation." The record contains no ruling on Agung's motion to reconsider. Because Agung's motion is still pending before

---

[10] At trial, Frank was 62 years old and Agung was 46.

[11] Agung requested a deviation from the standard calculation for temporary child support, which a court commissioner denied. And while the final child support order says that there was a "deviation requested by Agung," the record shows Agung did not brief the issue or raise it during the five-day trial.

the trial court, we do not consider her assignment of error. See RAP 2.2(a)(1),

(13) (generally, a party may appeal only a final judgment or order).

IV.  Attorney Fees

Agung argues that the trial court erred by denying her request for attorney

fees.  We disagree.

A party to a dissolution action is not entitled to attorney fees as a matter of

right.  In re Marriage of Stachofsky, 90 Wn. App. 135, 148, 951 P.2d 346 (1998).

But trial courts have discretion to award attorney fees under RCW 26.09.140 and

can consider the parties' relative needs versus their ability to pay.  In re Marriage

of Anthony, 9 Wn. App. 2d 555, 568, 446 P.3d 635 (2019).  We review a trial

court's attorney fee order for an abuse of discretion.  In re Marriage of Laidlaw, 2

Wn. App. 2d 381, 392, 409 P.3d 1184 (2018).

Here, the trial court denied Agung's requests for attorney fees, finding that

"neither party has the ability to pay the other party's attorney's fees."  Agung

argues the court abused its discretion because the evidence at trial "clearly

shows that the disparity between [her] and [Frank's] resources is significant and

substantial."

In deciding whether to award attorney fees, the trial court considered

Frank's financial declaration showing a net monthly income of $3,889.03 and

total available assets of $607,500.00.  Frank also declared that as of August 21,

2020, he had paid $62,742.00 in attorney fees.  Agung submitted her financial

declaration showing a net monthly income of $3,582.00 and total available assets

of $1,100.00.  She also declared that as of May 27, 2020, she had paid

13

$9,500.00 in attorney fees.  While Frank declared more assets than Agung, the declarations show that both parties have similar postdissolution income.  The trial court did not abuse its discretion by denying Agung's request for attorney fees.

Finding no reversible error, we affirm the final dissolution orders.[12]

WE CONCUR:

---

[12] Because we affirm the trial court on each of Agung's assignments of error, we do not reach Frank's conditional cross appeal.