## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Marriage of: | No.  53974-8-II |
| TAMARA RUTH OHMAN, | |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| TED RYAN OHMAN, | |
| Respondent. | |

PRICE, J. — Tamara Ohman appeals the superior court's final parenting plan entered in the dissolution of her marriage to Ted Ohman.[1]  Tamara argues that the superior court's findings regarding abusive use of conflict and domestic violence are not supported by substantial evidence. She also argues that the superior court erred by entering an abusive use of conflict finding without finding there was specific harm to the children.  Finally, Tamara argues that the superior court's findings demonstrate that the superior court based its decision on prejudice rather than the best interests of the children.  We affirm.

### FACTS

Tamara and Ted were married on June 27, 2009.  They have two children: W.O., born 2013, and P.O., born 2015.  Tamara and Ted separated in September 2017.  The separation occurred amid allegations that Ted had sexually abused the children.

---

[1] We refer to the parties by their first names for clarity.  We intend no disrespect.

On December 8, 2017, Tamara petitioned for dissolution of the marriage. Tamara had already obtained a separate protection order against Ted and sought a restraining order as part of the dissolution. Ted denied all allegations made supporting the existing protection order and sought a restraining order against Tamara based on domestic violence allegations that Tamara was physically abusive.

Prior to the dissolution trial, Ted was limited to supervised visitation with the children. The trial court also appointed a guardian ad litem (GAL). The GAL was ordered to investigate allegations of domestic violence and abusive use of conflict by both Tamara and Ted and allegations of sexual abuse by Ted.

Starting May 7, 2019, the trial court held a four day dissolution trial.

Tamara testified about the allegations that Ted sexually abused the children. Tamara explained that her concerns started in January 2016. At the time, Ted was taking one to two hours to put the children to bed. Tamara claimed that Ted eventually confessed that he spent that time looking at pornography while putting the children to bed. Tamara initiated counseling based on Ted's statement. Then, two weeks later, Tamara asked Ted if he had sexual thoughts or dreams about the children. Tamara testified that Ted told her he had had a sexual dream about W.O. When the parties were able to start therapy, Tamara gave all of this information to the therapist but the therapist did not express any concern.

Ted and Tamara continued with counseling, and Tamara did not take any other action until August 2017 when, according to Tamara, W.O. made specific disclosures to her about inappropriate behavior by Ted. Tamara took the children to a water park. While W.O. was changing into his swimsuit, he tried putting his mouth on his penis. Tamara asked what he was

doing, and W.O. said that Ted kissed his penis. Ted denied the allegation. Tamara testified that she was "stunned" by the disclosure. 2 Verbatim Report of Proceedings (VRP) at 69.

Tamara explained that Ted continued to push her about what she was going to do about W.O.'s disclosure, but she was focused on continuing counseling and had not made a decision about other actions to take regarding the disclosure. Then Ted's parents visited the family. Tamara testified that she and Ted acted like a family while his parents were there but agreed to report W.O.'s disclosure as soon as they left. Tamara dropped Ted's parents off at the airport and drove directly to Mary Bridge Children's hospital with W.O. to report his disclosures. The social worker at Mary Bridge advised Tamara to make a report to Child Protective Services (CPS) and Tamara did so. At the same time, Ted self-reported the allegations to his employer, the U.S. Coast Guard. Tamara testified that she and Ted agreed he would self-report the allegations on the same day she went to Mary Bridge.

After the allegations were reported to CPS and the Coast Guard, forensic interviews were scheduled for the children. Tamara testified that W.O. told her he was too scared to say anything before the interviews. At the interview, Tamara declined a military protective order from the U.S. Coast Guard. Tamara also started play therapy for W.O. with Deana Enebo-Short. Tamara testified that W.O. repeated his disclosure to Enebo-Short.

Shortly after the forensic interviews, Ted told Tamara that he was taking a polygraph for the Coast Guard. Tamara testified that Ted also told her to lie to investigators while making additional disclosures of inappropriate behavior with the children. Ted told Tamara that he was aroused thinking about Tamara when Tamara handed him P.O. Ted put P.O. on his lap while he was still aroused and eventually moved her off his lap.

3

Tamara testified that she filed for dissolution because it appeared, "based on talking to investigators, therapists, social workers[,] that abuse had occurred." 2 VRP at 79. When she filed her petition for dissolution, she obtained an order for up to six hours of supervised visitation between Ted and the children. The court also ordered psychological evaluations for Ted and Tamara. For the next eight months, W.O. was in treatment with Enebo-Short and was doing well, although he had made additional disclosures.

Tamara also explained that CPS had closed their investigation with an unfounded determination because the Coast Guard had failed to provide them with information. At the same time, Tamara testified that the Coast Guard investigation was proceeding and had not reached any conclusion. Further, Tamara explained that she brought a motion to have a GAL appointed based on the recommendation of the doctor who performed the psychological evaluations, Dr. Mark Whitehill. Tamara crafted her proposed parenting plan based on the recommendation of the GAL.

Tamara also addressed Ted's allegations of domestic violence. Tamara admitted that she had hit Ted, however she testified that she only did so because Ted demanded it. Tamara explained:

> So, for instance, there was one time—and this was pretty consistent with what happened, is that Ted would get mad, and I wouldn't say I forgive him right away or I wouldn't give him an appropriate answer. As you can tell, I am a foot shorter than Ted. And so he would get on his knees, and he would start beating his head open-handed himself, and he would tell me he wouldn't stop until I hit him. As a young wife, I had no idea what was going on.
>
> . . . .
>
> It struck me as—I was confused. It was not normal behavior, but I had never been married before. And I obeyed his command. I hit him. That was the first time it happened. And the—everything stopped. From that—that first instance.
>
> . . . .

4

Ted would continually ask me to hit him, to engage with him physically. He would throw—he would throw detergent on me, cereal on me in order to get me to interact with him physically. If I did not obey him and hit him in fights, he would pin me up against a wall. If I would hit him, he would put me up against the wall and tell me I was an abuser.

The point that I took from all of this and why I engaged with it as much as I did is because—to end the fight. If I did not engage, the fight would continue. There was a time that I was always scared for my safety. Even though he didn't hit me, he would use his body to barricade me in the room. He would push down doors where I—if I wanted to hide.

He ripped off—my shirt off my body. That's when I grabbed the iPad and swiped him to get him away from me. Ted continually would not engage in sex with me unless I was sleeping.

. . . .

I'd be dead asleep, and that's the only time Ted would try to attempt sex. And I would wake up to him having sex with me. I became so fearful of this continuing that I would go to bed telling him "Do not wake me up" or "Do not engage with sex while I'm sleeping."

So he continued, but it was more sporadic. And the last time he did that, I did get on him and I did hit him multiple times, and I ran in the other room. And that was the last time he did that.

2 VRP at 97-99.

Finally, Tamara testified about the children's behavior. At the time of trial, W.O. had an increase in sexual acting out. W.O. told Tamara that he asked another child to expose his penis. W.O. then told Tamara that he showed the other child his penis as well. Tamara contacted W.O.'s teacher to report the incident. The school created a safety plan for W.O. After the safety plan was in place, there was another incident where W.O. asked another child to pull down his pants.

Tamara testified that W.O.'s behaviors had been escalating at school, church, and home. After the incident at school, W.O. also acted out in church. Overall, W.O.'s behavior continued to get worse. W.O.'s treatment was transferred from Enebo-Short to Harborview for more intensive intervention.

During cross-examination, Tamara admitted that Ted did not actually admit to viewing pornography while putting the children to bed, but only that sometimes pictures of scantily-clad women would pop up on his phone while he was putting the children to bed. He only confessed to viewing pornography while he and Tamara were separated. Tamara also admitted that even after she claimed Ted disclosed looking at pornography while putting the children to bed and having sexual dreams about the children, Ted continued putting the children to bed until they separated. Tamara also admitted that she would talk to Ted about his confessions in front of the children.

Enebo-Short testified that she worked with W.O. and Tamara. Enebo-Short diagnosed W.O. with adjustment disorder and noted he exhibited a high level of anxiety symptoms. Enebo-Short intended to work on body safety and boundaries, emotional regulation, and processing grief regarding Ted's absence.

Enebo-Short testified regarding her documentation of disclosures from W.O. through the letters of disclosure she filed. Although Enebo-Short provided the disclosures to CPS, they closed the case as unfounded. Enebo-Short admitted that she had told CPS that W.O.'s disclosures had been scattered and convoluted. However, she testified that the disclosures had become more concrete over time. Enebo-Short testified that she was concerned and hoped that additional information would come out through the military investigation. However, she was not contacted by any other investigatory agency and received all of her updates from Tamara.

Some of Enebo-Short's notices of disclosure and treatment summaries were admitted as exhibits in the trial. In a notice of disclosure from November 2017, Enebo-Short disclosed that W.O. stated, "Dad always kisses my penis (brief pause), in my dreams." Ex. Record at 2503 (Ex. 71). And in a letter of disclosure dated January 24, 2018, Enebo-Short noted that she was including disclosures W.O. made to his mother as well as disclosures made directly to Enebo-Short. Ex. Record at 2105 (Ex. 37). Of the five disclosures contained in the letter, only one was made directly to Enebo-Short rather than being reported by Tamara or made when addressing a prior report made by Tamara. Enebo-Short reported that W.O. described a dream he had in which Ted pooped and peed on him while they were alone in a forest.

In a follow-up letter, filed in December 2018, Enebo-Short identified three additional disclosures that W.O. had made since January. Enebo-Short explained that all the additional disclosures had originally been made to Tamara:

> There were only three additional disclosures since January which all further elaborated on what [W.O.] remembers from his dreams where his dad touched him. These disclosures differ from previous ones as [they] do not specify that it occurred in a dream but in actual places. The detailed disclosures by [W.O.] were made to his mother though they were partially confirmed during sessions with this counselor but not in as much detail.

Ex. Record at 2506 (Ex. 72). Enebo-Short also explained that W.O.'s disclosures had been consistent and details were established as trust was built, but recently he seemed to have become conflicted about the disclosures. She also stated, "His statements over the months were so consistent, that the likelihood of something inappropriate happening is great. The severity of that cannot be determined based on W.O.'s statements and behaviors." *Id.* She also stated, "There are

not enough facts to prove something happened with [W.O.]'s father but [t]here is enough cause [for] this counselor to recommend time limited [to] day time visits only." *Id.* at 2507.

One of Enebo-Short's treatment summaries from March 2019 included the following statement:

> [W.O.] disclosed to his mom and other family member as well as this counselor inappropriate touch by his father. ("[D]ad kissed my penis.") He has exhibited inappropriate behavior (sexual as well as emotional [dy]sregulation), as reported by his mother and . . . . Given [W.O.]'s disclosures and behaviors it is very likely W.O. was sexually abused in some capacity and the most likely suspect is his father.

Ex. Record at 2173 (Ex. 43).

Amanda Sutherland, the CPS investigator assigned to investigate the allegations against Ted, also testified. Sutherland testified that when she received the intake she collaborated with Tacoma Police Department and the Coast Guard and it was determined that the Coast Guard would have jurisdiction over the investigation. As part of the investigation a forensic interview was conducted with W.O. W.O. did not make any disclosures during the forensic interview. Despite requests, the Coast Guard did not provide Sutherland with any documents regarding their investigation. Sutherland admitted she could have investigated independently but simply waited for the Coast Guard because they had assumed jurisdiction.

Sutherland closed the intake as unfounded based on lack of evidence. Sutherland explained that an unfounded determination means that the evidence that was gathered does not meet the Washington Administrative Code (WAC) definition for sexual abuse. Determinations generally need to be made within 60 days of the intake being accepted for investigation. CPS investigators can extend that deadline every 30 days if law enforcement is also investigating the case. Sutherland explained she believed that the Coast Guard was going to substantiate the allegations

8

and were not going to share their information with her. Therefore, she chose to close the intake rather than obtain a law enforcement extension.

Documentation of the CPS investigation was also entered into evidence. Two intakes at CPS were around the same time and related to W.O.'s disclosure that his father kissed his penis. The second intake was screened out because the allegations were already being investigated. A third intake was created after Tamara learned that CPS was not being given information that she was providing to the Coast Guard about additional disclosures.

The CPS records document Sutherland's communications with the Coast Guard as well as other references to the Coast Guard's investigation. One email from the Coast Guard investigator informed Sutherland that deception had been indicated on Ted's polygraph and he had also admitted to using P.O. for his sexual gratification. In the email, the investigator requested the information not be shared with Tamara because he had concerns "related to her and Ted's relationship/marriage and the manipulative and intentional (sic) questionable behavior and actions she has subjected her husband to over the past year." Ex. Record at 2037 (Ex. 32). Later, it was determined that Ted's disclosure regarding using P.O. for sexual gratification was related to an incident in which Ted had been sexually aroused thinking about Tamara when Tamara handed P.O. to him. Ultimately, the Coast Guard did not substantiate any allegations of sexual abuse by Ted against P.O.

The Coast Guard did substantiate allegations of sexual abuse against W.O. based on Ted's disclosures of sexual dreams and thoughts related to W.O. Ted denied any touching or any physical contact occurred and there is no contrary finding by the Coast Guard. Based on the substantiated finding, the Coast Guard recommended a psychological evaluation and counseling

for Ted. Sutherland noted, in her reports, that the information found by the Coast Guard was not sufficient to find sexual abuse under the WACs.

The CPS records also contain repeated references to Enebo-Short stating that W.O.'s disclosures were "scattered and convoluted" or disclosures that are unfocused and not concrete. Further, Sutherland noted that W.O.'s disclosures to Enebo-Short were not concrete enough to meet the definition of sexual abuse in the WACs.

Elizabeth Jeppesen was appointed as the GAL for the children. While Jeppesen was at Tamara's house conducting interviews, she witnessed an incident involving the children sexually acting out. Jeppesen testified that both children came out of the bedroom with a toy. P.O. stated that W.O. had tried to put the toy inside her while motioning toward her crotch. W.O. denied doing anything and said P.O. did it herself. According to Jeppesen, P.O. was clear that W.O. had tried to put the toy inside her, but also stated that if W.O. could not do it, she could do it herself.

Jeppesen's investigation was based on interviews with both parents as well as review of the information from Enebo-Short and CPS. Jeppesen determined that Ted and Tamara physically engaged with each other during the relationship, however, neither were "perpetuating a domestic violence situation." 3 VRP at 263. Jeppesen determined that Ted had sexually victimized both children. Jeppesen recommended only supervised visitation for Ted. Finally, Jeppesen determined Ted and Tamara did not have a healthy relationship but there was not an abusive use of conflict.

Ted also testified at the trial. He described the bedtime routine that he had for the children: he would bathe the children and then read them a book, then he would put P.O. down to sleep, followed by W.O. Generally, it would take each child about 30-45 minutes to go to sleep. While

waiting for the children to fall asleep, Ted would sometimes fall asleep. Sometimes he would spend time on his phone. Tamara rarely helped out with the bedtime routine.

Ted explained that he told Tamara that he had looked at pornography by himself, while she was away with the children in Colorado. He also told her that he had looked at ads with scantily clad women that popped up on his phone while he was putting the children to bed. He was clear that he never looked at pornography while he was around the children. Tamara became extremely angry and upset after this admission. Tamara started hitting Ted. Tamara began asking if Ted had sexual thoughts about the children. Tamara also put Ted on a diet in order to "build trust with her." 5 VRP at 414. The diet prohibited Ted from eating red meat, bread, refined sugar, or beer.

Ted also testified that he told Tamara about one dream he had that was marginally related to W.O. Ted explained that he had a dream that he was having sex with a woman and that dream resulted in him having a physiological response to the dream. After the nocturnal emission, Ted partially woke up and then fell back into another dream. In that dream he was concerned that he had touched W.O. At the time of the dreams, W.O. was sleeping in the bed with Ted and Tamara. But after Ted woke up, he realized he was not anywhere near W.O.

Ted testified that after he made these disclosures to Tamara, she would bring it up frequently. The children were present when Tamara would discuss it.

Six or seven months later, Ted stated that he was away for work when Tamara texted him that W.O. made the initial disclosure. Ted denied that he ever kissed W.O.'s penis. Ted explained he became fed up with Tamara accusing him of being a pedophile and told her, "Look, if you think I did this, you're enabling me, and you're a coward for not reporting me." 5 VRP at 419. Ted

testified that he was "trying to call her bluff." 5 VRP at 420. Tamara then reported the allegations to CPS, and Ted reported the entire situation to his command in the Coast Guard.

Ted testified that the Coast Guard's review board made a substantiated finding, at least in part to get resources for the family. The Coast Guard requested that Ted begin attending counseling and he complied. The Coast Guard continued to investigate, and Ted participated in several interviews and took a polygraph. Regarding the failed polygraph, Ted testified:

> [A]s we were going through the process, doing the polygraph, she's trying to get me, the polygrapher—I think that's what you would call them—she was just trying to get me to empty everything in my head. And I was like—I gave her what I thought was necessary. But she asked me a question of "Is there anything else you want to tell me?"
>
> And I said, "No." And then it did come up deceptive. And then I was like, "Well, there is this one instance where I don't know if this was—I don't think it was sexual abuse, but I had"—I told her of a time whenever [P.O.] was—Tamara and I had had sex. This was, like, early—this was, like, right when we moved. I know we're going to confuse the timeline again.
>
> This was in October of 2016. We were at church. Tamara and I had—finally had had some sex after a long time. I was thinking about it. And then I was slightly aroused. But Tamara gave me [P.O.]. I put her on my lap. And then I was like, "Is this weird? I don't know." And then I was like, "Okay. This is weird." And then I pushed her down onto my knees.
>
> And so I told the Coast Guard that—of that situation a whole—that happened the year prior.

5 VRP at 433. Ted also explained that he is generally anxious and guilt-ridden which may have contributed to failing the polygraph. Ultimately, when the Coast Guard completed its investigation "it was determined that the available evidence related to these alleged offenses was insufficient to support prosecution under [the Uniform Code of Military Justice] or administrative action due to misconduct." Ex. Record at 2521 (Ex. 104).

Ted testified about several incidents in which Tamara would strike him repeatedly after getting upset at something he had done. He also testified about incidents when Tamara had hit him with an iPad and an ice pack. He also testified that Tamara made him take the blame for everything and he felt that everything was his fault. On a few occasions he hit himself in an attempt to get Tamara to hit him because he felt he needed to be punished for doing something wrong. Ted testified that Tamara would call him "dumb-ass" and "fuckhead." 5 VRP at 407. After the disclosures, Tamara would call him "creep," "pedophile," and "predator." *Id.* Ted did not tell anyone about the abuse because it would cause shame for Tamara and he was embarrassed about it.

Dr. Whitehill performed psychological evaluations and parenting assessments for both Tamara and Ted. Dr. Whitehill's evaluation of Tamara noted that she generated invalid test results on multiple psychological tests. On the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), Tamara "generated an invalid report as a result of the adoption of an excessively defensive test-taking posture, suggesting an unwillingness or inability on her part to disclose personal information." Ex. Record at 2136 (Ex. 41). Similarly, on the Millon Clinical Multiaxial Inventory-IV (MCMI-IV), Tamara "generated a report with a significantly low disclosure index, which recapitulates the findings of the MMPI-2 and indicates an effort to minimize psychological difficulties." *Id.* And on the Child Abuse Potential Inventory-Form VI (CAPI), Tamara "generated an invalid report as a result of a 'fake-good' profile, suggesting that she was attempting to represent herself as an unduly virtuous parent." Ex. Record at 2136-37 (Ex. 41). Dr. Whitehill noted that Tamara exhibited histrionic and turbulent personality traits.

Dr. Whitehill offered the following conclusions:

2) Psychological test results are difficult to interpret in light of the severe level of defensiveness seen in the major psychometric measures (MMPI-2, MCMI-IV & PSI-4), but which nonetheless suggest the presence of maladaptive personality functioning, in which traits of impulsivity, a proneness to rules infractions, and a tendency to externalize psychological difficulties.

3) [Tamara's] conduct during a parenting observation in the family home was problem-free and reflected a mother with excellent parenting capabilities.

. . . .

5) Troubling though, is evidence in the discovery that appears to confirm Ted's allegations of repeated physically abusive conduct directed at him by [Tamara] (ripped clothing, gash on elbow following reported throwing of an iPad at him). Assuming these incidents were caused by [Tamara], I would not term Ted's bringing them to the attention of the court a "smokescreen."

6) Of course, it is for the trier of fact and not for the forensic psychological evaluator to assess the validity of these claims and counterclaims. The issue before the undersigned is whether [Tamara] manifests psychological difficulties or parenting deficits that would impair her capacity to parent. Certainly, no [RCW 26.06.191] factors appear from this assessment, nor were there any observed deficits seen in her interactions with the children. The extent of any psychological infirmities remains difficult to assess given the aforementioned defensive posture seen on testing.

Ex. Record at 2139-40 (Ex. 41). Dr. Whitehill deferred any parenting plan recommendations to the GAL and Ted's therapist. Dr. Whitehill also recommended that Tamara participate in co-parent counseling with Ted. And Dr. Whitehill recommended that Tamara participate in a domestic violence assessment and follow all recommendations.

As part of Dr. Whitehill's evaluation of Ted, another sexual history polygraph was conducted. The report noted that Ted was attempting deception when he answered no to the following questions:

1) Other than what you reported, have you had any other type of sexual contact with your biological children?

2) Have you had any sexual contact with your biological children that you did not report?

3) Have you ever masturbated to thoughts, images, or fantasies of your biological children?

Ex. Record at 2161 (Ex. 42) (italics omitted). In his conclusions, Dr. Whitehill noted that the polygraph findings may be explained because Ted "is so naturally anxious and guilt-ridden that a reliable polygraph result cannot be achieved." Ex. Record at 2169 (Ex. 42).

Dr. Whitehill did not identify any invalid reports on the numerous psychological tests Ted completed. Dr. Whitehill identified Ted as having dependent personality disorder with histrionic and narcissistic traits and generalized anxiety disorder. Dr. Whitehill also offered the following conclusions:

10) The variety of assessment tools employed by the undersigned specific to sexual deviance provide a generally favorable picture of [Ted's] sexual dangerousness. As noted, while he was found "deceptive" on a sexual history polygraph administered at this office, on all other measures of sexual deviance he was found to be: unlike known child molesters in thinking and behavior (i.e., MSI-II findings); at an exceedingly low risk to perpetrate sexual abuse or crimes of violence (i.e., VRAG-R results); and to have a few static and dynamic risk factors that would render him at risk to perpetrate sexually abusive behavior (e.g., SVR-20 analysis). Also, his self-reported sexual history is essentially benign.

11) However, psychological testing of [Ted] revealed the presence of a personality disorder characterized by significant dependency needs, social alienation, and a penchant to engage in self-indulgent and high-stimulation behavior followed by an expression of shame and remorse. While such characteristics are sometimes seen in the incest perpetrator, they are also seen in persons prone to pornography use and substance abuse.

12) Ultimately, it is for the trier of fact and not for the forensic psychological evaluator to establish whether [Ted] has engaged in the sexual abuse of his children. The issue before the undersigned is whether [Ted] manifests psychosexual difficulties or parenting deficits that would impair his capacity to parent. While he is in need of services to rectify the deficits identified here (see below), it is believed that with the right resources he can effectively and safely parent.

Ex. Record at 2170 (Ex. 42). Dr. Whitehill recommended that Ted engage in a risk management program. He also recommended Ted participate in a domestic violence survivor's group and co-parenting counseling.

Following Dr. Whitehill's recommendation Tamara completed a domestic violence assessment with Bill Notarfrancisco. Notarfrancisco recommended continued counseling to provide information and skills related to domestic violence, anger management, and impulse control. Notarfrancisco also recommended continuing counseling to gain insight into Tamara's personality functioning related to histrionic and obsessive compulsive personality traits. Ted completed the risk management program recommended by Dr. Whitehill.

Following trial, the trial court entered final dissolution orders distributing the parties' property and debt. No restraining orders were entered. The trial court reserved a decision on the final parenting plan and ordered additional briefing on the parenting issues.

Prior to entering a final parenting plan, the trial court provided an extensive oral ruling. The trial court reviewed the background of the parties' marriage including sexual issues that were pervasive between the parties. The trial court also discussed the demeanor of both parties and how the parties' presentation contributed to her determination that Ted was credible while Tamara was not. The trial court's oral ruling was an extremely detailed review of the allegations made by the parties as well as the testimony and evidence related to those allegations. In regard to abusive use of conflict, the trial court explained:

> What arises from an exhaustive review of this evidence is that the initial report of
> alleged abuse emerged during a period of time during which this couple was
> engaged in serious, contentious fighting. The marriage was eroding. The fighting
> was often conducted in the presence of the children. It appears [Tamara] was prone

16

to extreme anger and histrionics, resulting in name-calling, throwing things, destroying [Ted]'s clothing, and physical assault.

[Ted], suffering from severe anxiety, was so distraught by the idea that he might have done something wrong that he confessed every single behavior he could think of that could possibly be misconstrued, which served only to fuel [Tamara's] agenda and rage. In frustration, [Ted] finally told her to report him if she really believed something had happened.

[Tamara], by now entrenched in her narrative, then continued to make allegations against [Ted] even after CPS determined the initial allegations were unfounded. Thereafter, this case has spun out of control.

The Court's biggest concern is the damage that these parties' conflict and highly contentious behavior has already caused the children.

7 VRP at 608. The trial court also noted, "After listening to four days of testimony, reviewing 79 exhibits and additional briefing, which I want to add I spent over 30 hours reviewing this evidence, I can find no substantive evidence to support the allegations being made by [Tamara] against [Ted]." 7 VRP at 609.

In its final parenting plan, the trial court found that Tamara had a history of domestic violence and had engaged in an abusive use of conflict. Although the trial court found that there were reasons to place limitations on Tamara, it did not limit Tamara's residential time with the children because she had historically been the primary parent, Ted had not had unsupervised contract with the children since September 2017, and he continued to be active duty military. The trial court also did not limit decision-making or dispute resolution. However, the trial court ruled that "[l]imitations on TAMARA OHMAN'S contact with the children may occur if further false allegations of sexual abuse are made." Clerk's Papers (CP) at 261. The trial court ordered Tamara engage in a domestic violence program.

The trial court also made the following additional findings of fact:

17

A. The Court finds no substantive evidence the Respondent/Father sexually abused the children.

B. Child Protective Services issued unfound[ed] findings on 10/26/17 and 1/2/18.

C. Neither child disclosed abuse during the 9/14/17 forensic interview attended by representatives from the Mary Bridge Children's Advocacy Center, TPD, U.S. Coast Guard, a Social Worker and Petitioner/Mother.

D. Tacoma Police Department investigated allegations of sexual abuse by the Respondent/Father but criminal charges [were] not filed.

E. U.S. Coast Guard determined there was no information to suggest that there was any evidence that sexual abuse according to WAC 388-15-009 occurred. "There is concern about [Petitioner/Mother] manipulating and intentional questionable behavior toward [Respondent/Father]."

F. The Pierce County Prosecutors Office declined to prosecute Respondent/Father for sexual abuse.

G. Dr. Whitehill Ph.D. conducted a psychosexual evaluation and parenting assessment of Respondent/Father which determined there is ". . . scant dynamic risk factors predictive of sexual re-offence. . . . Nothing apart from Ms. Ohman's allegations raise questions of sexual deviance." Dr. Whitehill Ph.D. further opined that with the right resources, Mr. Ohman is able to effectively and safely parent. Respondent/Father has completed the Risk Management class recommended by Dr. Whitehill Ph.D.

H. Dr. Whitehill Ph.D. opines that Respondent/Father's severe anxiety most likely contributed to the three deceptive responses during a polygraph examination administered in his office.

I. Dr. Whitehill Ph.D. conducted a psychological evaluation and parenting assessment of Petitioner/Mother which generated invalid test scores due to excessively defensive test-taking posture. Dr. Whitehill Ph.D. concluded, "The extent of any psychological infirmities remains difficult to assess given the aforementioned defensive posture seen on testing." Thus, Ms. Ohman's evaluation is not a good measure of her psychological state.

J. The evidence upon which the Petitioner/Mother relies (GAL report, Wexler letter, Enebo-Short letters, Tacoma Public School Risk assessment) contain no substantive evidence and are rooted in the allegations as reported by the Petitioner/Mother.

K. The child's third party disclosures are "scattered" and "not concrete" per his counselor Deana Enebo-Short.

CP at 268-69.

The trial court's parenting plan provided residential time with Ted on the weekends until September 2019. After September 2019, the children would reside with each parent on alternating weeks, assuming Ted had housing that allowed for each child to have separate bedrooms. The trial court ordered joint decision making.

Tamara appeals.

## ANALYSIS

### I. LEGAL PRINCIPLES

Trial courts have broad discretion in developing parenting plans. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). The trial court's discretion is guided by several statutory provisions including RCW 26.09.002, which declares that "the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities," and RCW 26.09.191, which governs limitations on parenting plan provisions. *See Katare*, 175 Wn.2d at 35-36.

We review a trial court's parenting plan for an abuse of discretion. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). A trial court abuses its discretion when a decision is manifestly unreasonable or based on untenable grounds or reasons. *Id.*

We review the trial court's findings of fact to determine whether substantial evidence supports them. *Id.* Evidence is substantial if it is sufficient in quantity to persuade a fair-minded person of the truth of the declared premise. *Id.* On appeal, we do not review credibility determinations or reweigh the evidence. *Id.*

"[D]ecisions in a dissolution action will seldom be changed upon appeal." *In re Marriage of Landry*, 103 Wn.2d 807, 809, 699 P.2d 214 (1985). As our Supreme Court has explained:

> Such decisions are difficult at best. Appellate courts should not encourage appeals by tinkering with them. The emotional and financial interests affected by such decisions are best served by finality.

*Id.* And because the trial court hears the evidence firsthand and has a unique opportunity to observe the witnesses, we are " 'extremely reluctant to disturb child placement dispositions.' " *In re Parentage of Schroeder*, 106 Wn. App. 343, 349, 22 P.3d 1280 (2001) (quoting *In re Marriage of Schneider*, 82 Wn. App. 471, 476, 918 P.2d 543 (1996), *overruled on other grounds by In re Marriage of Littlefield*, 133 Wn.2d 39, 940 P.2d 1362 (1997)).

II. CHALLENGED FINDINGS OF FACT

As an initial matter, Tamara assigns error to several individual findings of fact entered by the trial court. We address each to determine whether the trial court's findings of fact are supported by substantial evidence.

First, Tamara assigns error to the trial court's finding:

> U.S. Coast Guard determined there was no information to suggest that there was any evidence that sexual abuse according to WAC 388-15-009 occurred.

CP at 269. Although the U.S. Coast Guard made its finding based on the Uniform Code of Military Justice and not the WAC, we determine this finding of fact was supported by substantial evidence. A review of the record as a whole shows that the Coast Guard only ever determined that Ted disclosed some thoughts and dreams that caused concerns and prompted the Coast Guard to recommend counseling. Sutherland's notes from her CPS investigation show that she reviewed the information from the Coast Guard and determined nothing the Coast Guard uncovered met the WAC definition for sexual abuse. Therefore, this finding is supported by substantial evidence.

Second, Tamara assigns error to the trial court's finding:

> Dr. Whitehill Ph.D. conducted a psychosexual evaluation and parenting assessment of Respondent/Father which determined there is ". . . scant dynamic risk factors predictive of sexual re-offence. . . . Nothing apart from Ms. Ohman's allegations raise questions of sexual deviance."

CP at 269. It appears that the trial court is referencing a specific paragraph from Dr. Whitehill's commentary on Ted's Sexual Violence Risk Assessment, which stated:

> Scant dynamic risk factors predictive of sexual re-offense are found in this analysis; [Ted] has no known criminal history, substance abuse problems, or evidence of an acute mental illness. . . . Nothing apart from Tamara's allegations raises questions as to sexual deviance, which renders this item as unclear.

Ex. Record at 2166 (Ex. 42). As the trial court was directly quoting from language Dr. Whitehill used in his report, this finding is supported by substantial evidence.

> Third, Tamara assigns error to the trial court's finding:

> Dr. Whitehill Ph.D. opines that Respondent/Father's severe anxiety most likely contributed to the three deceptive responses during a polygraph examination administered in his office.

CP at 269. In his evaluation, Dr. Whitehill explicitly noted that Ted's polygraph results could be explained because Ted is naturally anxious and guilt-ridden. And a review of the whole record clearly shows that Ted's anxiety and guilt contributed to him regularly disclosing otherwise benign instances such as seeing ads with women on his phone or being handed P.O. while aroused thinking about something else. A full review of the record shows that this finding is supported by substantial evidence.

> Fourth, Tamara assigns error to the trial court's finding:

> The evidence upon which the Petitioner/Mother relies (GAL report, Wexler letter, Enebo-Short letters, Tacoma Public School Risk assessment) contain no substantive evidence and are rooted in the allegations as reported by the Petitioner/Mother.

21

CP at 269. The GAL report contains one observation independent of the allegations reported by Tamara—the GAL witnessing the children's sexualized acting out. Although this may be substantive evidence that the children are exhibiting inappropriate behavior, it is not substantive evidence that Ted sexually abused the children. Similarly, the Tacoma Public School records show that W.O. is suffering from behavioral problems and inappropriate sexual acting out but they, too, do not provide proof that Ted sexually abused W.O. Wexler is Tamara's therapist and the information he has received about the situation would have been reported by Tamara.[2] Finally, a thorough review of Enebo-Short's letters show there were extremely limited occasions when W.O. made a spontaneous disclosure to Enebo-Short independent of any report from Tamara. The majority of allegations contained in Enebo-Short's letters are directly related to reports Tamara made to Enebo-Short regarding W.O.'s behaviors or disclosures. Therefore, this finding of fact is supported by substantial evidence.

Fifth, Tamara assigns error to the trial court's finding:

The child's third party disclosures are "scattered" and "not concrete" per his counselor Deana Enebo-Short.

CP at 269. Sutherland's notes addressing Enebo-Short's discussion of the disclosures specifically state that Enebo-Short described W.O.'s disclosures as scattered, convoluted, and not concrete. During her testimony, Enebo-Short admitted that she had made that statement to Sutherland. And

___

[2] The Wexler letter referred to in the trial court's finding of fact was a letter Dr. Steven Wexler submitted as a brief summary of his initial assessment of Tamara. The bulk of the letter references statements made by Tamara about the situation. Dr. Wexler notes that he met with Ted once in which Ted indicated he had inappropriate thoughts and dreams about the children. Ted's thoughts and dreams have been discussed thoroughly in the evidence presented to the trial court and, are not by themselves, evidence of sexual abuse.

although Enebo-Short testified the W.O.'s disclosures became more concrete as they built a therapeutic relationship, she did not testify about any disclosures W.O. had made that were any more coherent or concrete than the ones that she included in her letters to the court. Accordingly, this finding is supported by substantial evidence.

Based on a thorough review of the record at trial, the challenged findings of fact are supported by substantial evidence in the record.

III. ABUSIVE USE OF CONFLICT

Tamara argues that the trial court erred by finding that she engaged in an abusive use of conflict because she was only making good faith reports of the disclosures W.O. made to her. Tamara also argues that the trial court improperly found that she engaged in abusive use of conflict because the trial court did not make a finding that the abusive use of conflict was harming the children. We disagree.

Under RCW 26.09.191(3)(e), a trial court may limit any provision of a parenting plan based on "[t]he abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development." A finding of actual damage to the child's psychological

development is not necessary to make a finding that a parent has engaged in the abusive use of conflict.[3] *In re Marriage of Burrill*, 113 Wn. App. 863, 872, 56 P.3d 993 (2002).

Here, the trial court did not rely on a single report to make an abusive use of conflict finding. Rather, as evidenced by the trial court's lengthy oral recitation of the relationship's historical background, the trial court considered the entire situation between Tamara and Ted leading up to the trial. The trial court noted that Tamara had become entrenched in her narrative and continued to make allegations resulting in the case becoming out of control. This is supported by the fact that Tamara conflated Ted looking at pornography alone and seeing ads containing scantily clad women while putting the children to bed and then spending months making accusations related to this behavior within ear shot of the children. And there was extremely limited evidence corroborating Tamara's reports of W.O.'s disclosures—such that neither CPS nor the Coast Guard found that Ted engaged in sexual misconduct with his children.

Tamara appears to argue that a finding that she engaged in an abusive use of conflict is mutually exclusive with the fact that she is a good parent with genuine concern for her children. This is not the case. The trial court did not dispute Tamara's parenting ability and it did not limit Tamara's parenting time with the children. The abusive use of conflict finding is focused on

---

[3] To the extent that Tamara relies on *In re Marriage of Chandola*, 180 Wn.2d 632, 327 P.3d 644 (2014), to argue that the trial court was required to make a finding of actual harm to the children, this argument is misplaced because *Chandola* did not address findings related to the abusive use of conflict. *Chandola*, 180 Wn.2d at 644-46. Even if we did require a "particularized finding of a specific level of harm" before the trial court could impose limitations, the children in this case are clearly demonstrating sexualized acting out behaviors and other behavioral problems. The trial court was within its discretion to determine that the children's behavior was evidence of harm caused by the ongoing conflict between the parents and, therefore, that the abusive use of conflict resulted in harm to the children.

Tamara's relationship with Ted, not the children. The trial court determined that the out of control nature of this case is damaging to the children. Accordingly, the trial court did not abuse its discretion by finding that Tamara engaged in an abusive use of conflict.

Finally, Tamara argues that the trial court's ruling that "[l]imitations on [Tamara's] contact with the children may occur if further false allegations of sexual abuse are made[,]" is untenable because it prevents her from reporting child abuse. CP at 261. As the trial court noted, this entire case spun out of control because Tamara "continued to make allegations against [Ted] even after CPS determined the initial allegations were unfounded." 7 VRP at 608. The trial court's limitation does not impose any specific or immediate consequence on allegations of sexual abuse and is limited to reports of false allegations. Therefore, this ruling does nothing more than require Tamara to exercise judgment in determining whether she should make reports and to prevent further allegations related to what has already been reported and investigated. By limiting the ruling to "further false allegations," the ruling is clear that there will not be consequences for future new, good faith, accurate reports if it is necessary. Accordingly, the trial court's limitation is not untenable.

IV. DOMESTIC VIOLENCE

Tamara also argues that the trial court erred in finding that she engaged in domestic violence. We disagree.

"Domestic violence" is defined as: "(a) Physical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, sexual assault, or stalking as defined in RCW 9A.46.110 of one intimate partner by another intimate partner; or (b) physical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or

25

assault, sexual assault, or stalking as defined in RCW 9A.46.110 of one family or household member by another family or household member." RCW 26.50.010(3); RCW 26.09.191(1)(c).

The trial court determined that Ted's disclosure regarding the physical altercations between Tamara and him were credible. Ted testified that Tamara regularly physically engaged with him by hitting him either with her hands or with objects such as an iPad or an ice pack. Tamara, herself, admitted to repeatedly hitting Ted, albeit with the excuse that Ted was asking for it. The trial court had substantial evidence to determine that Tamara physically assaulted Ted during their marriage. Therefore, the trial court did not abuse its discretion by determining that Tamara engaged in domestic violence.

V. PREJUDICE TOWARD TAMARA

Finally, Tamara argues that the trial court was prejudiced against her and it overshadowed its consideration of the best interests of the children and led the trial court to improperly disregard any evidence favorable to Tamara. Tamara asserts the trial court "did not weigh material evidence as much as it patchworked findings favorable only to [Ted]" and requests that this case be remanded to a new judge. Petitioner's Amended Br. at 31. We disagree.

Tamara appears to argue that the trial court exhibited prejudice against her by disregarding the evidence that supports her position and finding that Ted was credible. Specifically, Tamara seems to argue that there was objective evidence that Ted sexually abused the children and the trial court disregarded that evidence. But, as explained above, substantial evidence supported the trial court's finding there was no substantive evidence supporting the allegations of sexual abuse against Ted. The trial court did not disregard evidence that sexual abuse had occurred but rather

reviewed the record as a whole and made a determination that the majority of the evidence supporting Tamara's allegations were grounded in Tamara's reported statement.

Based on a review of the trial record we can find no evidence that the trial court was prejudiced against Tamara. Rather, the trial court properly performed its function in this very difficult case, weighed evidence, and made credibility determinations. We will not reweigh evidence or review credibility determinations on appeal. *Black*, 188 Wn.2d at 127. Accordingly, there are no grounds for determining that the trial court was prejudiced against Tamara.

A complete review of the record before the trial court shows that the trial court's findings were supported by substantial evidence. Further, the trial court did not err in making its findings regarding abusive use of conflict or domestic violence. And Tamara has failed to show that the trial court was prejudiced against her. Accordingly, we affirm the trial court's parenting plan.

## VI. TED'S REQUEST FOR COSTS AND FEES

Ted requests costs and attorney fees under RAP 18.1, RAP 14.2 and RCW 4.84.030. RAP 18.1 allows this court to award attorney fees on appeal "[i]f applicable law grants to a party the right to recover reasonable attorney fees or expenses." Under RAP 14.2, we will award costs to the party that substantially prevails on appeal. Costs on appeal generally only include statutory attorney fees. RAP 14.3(a). In addition, RCW 4.84.030 also entitles a prevailing party to recover costs, including statutory attorney fees. RCW 4.84.010, .030.

Because we affirm the superior court's parenting plan, Ted is the prevailing party on appeal. Accordingly, Ted is entitled by statute and court rule to recover his costs. A commissioner of this court may determine and award costs as provided in RAP 14.6. RAP 14.1(c); RAP 14.6.

We affirm the superior court's final parenting plan.

No. 53974-8-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

GLASGOW, C.J.

VELJACIC, J.